**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 26-cv-25395

ICEBREAKERS, *et al.*,

     *Plaintiffs*,

v.

JEANETTE NUÑEZ, *et al.*,

     *Defendants*.

_____/

**PLAINTIFFS' EXPEDITED PRELIMINARY INJUNCTION MOTION**

"Nowhere is free speech more important than in our leading institutions of higher learning." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022). But the folks in charge at Florida International University disagree. They adopted a sweeping ban on "expressive activities" indoors on campus. Then, when students staged a brief, non-disruptive, silent protest at a university event, FIU brought the hammer down. The students were found guilty of violating the "no expressive activities indoors" policy in a student-conduct proceeding. As sanctions, FIU ordered them to submit a "video reflection," adding a compelled-speech insult to the initial constitutional injury. Plaintiffs—the seven students charged with misconduct ("Individual Plaintiffs") and the group that organized the protest, ICEBreakers—seek a preliminary injunction against FIU President Jeanette Nuñez and Board of Trustees Chair Carlos Duart to prevent further violation of their First Amendment rights and to allow them to exercise their rights of free expression in the upcoming school year.

Plaintiffs respectfully request a ruling by September 4, 2026, when six Individual Plaintiffs must submit their university-ordered "video reflection" sanction or else face further punishment, as well as to enjoin the seventh Individual Plaintiff's ongoing disciplinary proceedings. Plaintiffs also seek an expedited ruling because they wish to engage in additional "expressive activities" forbidden by FIU's policy during the upcoming semester, which starts on August 24.

**FACTUAL BACKGROUND**

**A. Immigration Enforcement in America and Plaintiffs' Protest**

For over a year, the nation has experienced cruel, unprecedented and often illegal attacks on immigrant communities. Attack strategies have been wide-ranging, from changes to visa and

immigration status regulations, to armed conflict and mass immigration sweeps and detention.[1]

The nation's education institutions have served a front in this conflict. On April 10, 2025, the federal government revoked 29 international student visas for Florida university students. Eighteen of those students were enrolled at FIU.[2] Amidst the fear and uncertainty prompted by the visa revocations, the next day, FIU confirmed its intent to deputize its campus police for federal immigration enforcement duties through ICE's 287(g) program.[3] Prior to 2025, no university or college police department had ever participated in a 287(g) agreement, anywhere in the country.[4] FIU was the first volunteer. 287(g) agreements deputize local police with the powers of ICE agents and empower them to conduct federal immigration enforcement.

---

[1]   *E.g.*, Connor Greene, *As ICE Detention Expands, Deaths Reach a 22-Year High*, Time (Aug. 10, 2026), https://time.com/article/2026/08/10/ice-detention-deaths-immigration/; Curtis Bunn & Erika Angulo, *Haitians Face Deportation to a Country Devastated by Violence and Famine*, NBC News (June 30, 2025), https://www.nbcnews.com/news/nbcblk/trump-administration-ends-tps-haitians-safety-concerns-rcna216053; Philip Marcelo & Rebecca Boone, *Feds Turn Over Evidence in Renee Good and Alex Pretti Killings to Minnesota After Months of Delay*, AP (July 13, 2026), https://apnews.com/article/immigration-enforcement-minnesota-alex-pretti-renee-good-21835226891f2a8d91710519b457031d; Jacob Soboroff & Amel Ahmed, *U.N. Report Sounds Alarm over Trump's Mass Firing of Immigration Judges*, MS Now (July 22, 2026), https://www.ms.now/news/united-nations-report-immigration-judges-trump-authoritarianism; Ryan Mancini, *Immigration Officers Called Latinos Racial Slurs During Stops*, The Hill (July 29, 2026), https://thehill.com/homenews/administration/5996553-aclu-socall-immigration-video-slurs/; Doina Chiacu & Kristina Cooke, *US to Tighten Visa Regulations for Foreign Students, Journalists*, Reuters (updated July 17, 2026), https://www.reuters.com/world/us-change-visa-regulations-foreign-students-journalists-2026-07-16/; Jazmine Ulloa & Luis Ferré-Sadurní, *Federal Judge Bars ICE from Making Arrests in Immigration Courts*, N.Y. Times (June 23, 2026), https://www.nytimes.com/2026/06/23/us/ice-arrests-immigration-courts-california.html; Florantonia Singer, Macarena Vidal Liy, & Patricia San Juan Flores, *Venezuelans Deported to Bukele's Mega-Prison Reveal Torture and Other Abuses: 'They Said We Would Only Leave in a Black Bag'*, El País (Nov. 12, 2025), https://english.elpais.com/international/2025-11-12/venezuelans-deported-to-bukeles-mega-prison-reveal-torture-and-other-abuses-they-said-we-would-only-leave-in-a-black-bag.html.

[2]   Clara-Sophia Daly, *Visa Crackdown Leaves FIU's Foreign Students Silenced by Fear*, Miami Herald (Apr. 11, 2025), https://www.miamiherald.com/article302800169.html; Clara-Sophia Daly, *Trump Administration's Crackdown on Student Visas Hits Florida Universities*, Miami Herald (updated Apr. 18, 2025), https://www.miamiherald.com/article304201881.html.

[3]   Clara-Sophia Daly & Ana Ceballos, *FIU Police Sign on to Help DeSantis and Trump with Immigration Enforcement*, Miami Herald (updated Apr. 18, 2025), https://www.miamiherald.com/article304052556.html.

[4]   Kate Payne, *Florida Universities to Deputize Campus Police for Immigration Enforcement*, WJXT (Apr. 14, 2025), https://www.news4jax.com/news/florida/2025/04/14/florida-universities-to-deputize-campus-police-for-immigration-enforcement/.

In response to this unprecedented intrusion into their campus life, FIU students, faculty, and other members of the university community have spoken out and taken actions to protest both the federal government's anti-immigrant policies and the university's complicity.[5] In particular, a student-led coalition called ICEBreakers has mobilized students, faculty, and others to end FIU's partnership with ICE. Ex. 1 (Fondren Decl.) ¶¶ 2–3. Through social media, education, town hall gatherings, public records requests and other events held since its forming, ICEBreakers has highlighted ICE's inhumane practices and the cruelty of the federal and state governments' immigration policies. *Id.* ¶ 5.

One ICEBreakers protest took place on March 13, 2026, at a university event featuring FIU President Nuñez and baseball player Alex "A-Rod" Rodriguez. *Id.* ¶ 6. The event was held at FIU's Student Academic Success Center, in a large auditorium with a capacity of 700 people. *Id.* ¶ 7. The event was part of FIU's Presidential Speaker Series, which has hosted a number of speakers with diverse and varied political views. *Id.* ¶ 8. The event was open to the public. *Id.*

Several ICEBreakers members, including the Individual Plaintiffs, engaged in a silent, peaceful protest during the event by standing up, briefly facing the audience, and then walking out. Exs. 2–7 (Individual Plf. Decls.) ¶¶ 4–5; Ex. 8 (Luna Decl.) ¶¶ 3–4. They each wore shirts prominently bearing the message "ICE OFF FIU." Exs. 2–7 ¶ 6; Ex. 8 ¶ 5. Plaintiffs were silent during the duration of their protest. Exs. 2–7 ¶ 7; Ex. 8 ¶ 6. President Nuñez and A-Rod continued their conversation during and after Plaintiffs' protest. Exs. 2–7 ¶ 8; Ex. 8 ¶ 7. The protest neither materially nor substantially disrupted the event or university operations. Exs. 2–7 ¶ 9; Ex. 8 ¶ 8. In fact, the university staff member who oversaw the event acknowledged that the protest "did not disrupt the event, and the speakers were able to continue their discussion." Ex. 9 (Rivera Email). Further, she stressed that "[n]o other attendees approached [her] directly to raise concerns about the incident." *Id.*

The entire protest, from when the students stood up until they left the auditorium of their own accord, was less than five minutes long. *Id.*; Exs. 2–7 ¶ 10; Ex. 8 ¶ 9. At no point while the students were standing at their seats did anyone ask them to sit down or leave. Exs. 2–7 ¶ 11; Ex. 8 ¶ 10. At no point did any event attendees complain to any FIU staff that the students were

---

[5]   *E.g.*, Natalie La Roche Pietri, *FIU Faculty, Students Protest University Partnership with Federal Immigration Authorities*, WLRN (Apr. 15, 2025), https://www.wlrn.org/education/2025-04-15/fiu-faculty-students-protest-university-partnership-with-federal-immigration-authorities.

disturbing them or blocking their view. Exs. 2–7 ¶ 12; Ex. 8 ¶ 11; Rivera Email; *see* Ex. 10 (Police Report) at 5.

### B. FIU's Ban on Expressive Activities Indoors

Student conduct at FIU is governed by university policies, including a Student Conduct and Honor Code and other regulations.[6] One of these is Regulation 110, "Expressive Activities in Outdoor Areas on Campus" (Ex. 11). Section 3 of Regulation 110 provides that "protests, parades, marches, picketing, demonstrations, and other similar expressive activities are prohibited inside University buildings or other University indoor facilities." "Expressive activities" are defined as "activities such as assemblies, demonstrations, exercises of free speech, protests, parades, marches, and picketing *protected under the First Amendment to the United States Constitution and Article 1 of the Florida Constitution*." Reg. 110(1)(a) (emphasis added).

FIU's Office of Student Conduct & Academic Integrity (SCAI) investigated Plaintiffs' silent protest, eventually charging the Individual Plaintiffs with misconduct for failing to comply with Regulation 110(3) based on their silent protest.[7] Ex. 13 (Charge Letter);[8] Exs. 2–7 ¶¶ 13–14; Ex. 8 ¶¶ 12–13. FIU held misconduct hearings for six of the Individual Plaintiffs (all but Plaintiff Kuhlman, whose hearing is yet to be scheduled), and found all six responsible for the misconduct charged. Ex. 14 (Decision Letter); Exs. 2–7 ¶ 16; Ex. 8 ¶ 15. FIU's sanctions include a "video reflection" requiring each student to "explain[] your understanding of FIU Regulation 110, what is expected under FIU Regulation 110 related to indoor and outdoor areas, and how you will apply what you have learned moving forward." Ex. 14. After FIU denied administrative appeals, the video reflections are due September 4, 2026. Ex. 15 (Letter Denying Appeal); Ex. 16 (Letter Granting Extension).

If the Individual Plaintiffs (except Kuhlman) do not submit a video reflection by then (or if

---

[6]   Student Conduct and Academic Integrity, FIU, https://dasa.fiu.edu/all-departments/student-conduct-and-academic-integrity/.

[7]   Underscoring the protest's nondisruptive nature—as well as FIU's eagerness to punish nondisruptive expressive activities indoors—the SCAI official who charged the students stressed that she was *not* charging them with disruptive conduct, because that was not supported by her investigation. Exs. 2–7 ¶ 15; Ex. 8 ¶ 14. FIU policy defines "disruptive conduct" as "[b]ehavior that substantially and materially disrupts, disturbs, impairs, interferes with or obstructs the orderly conduct, processes and functions of the University or the rights of other members of the University community." Ex. 12 (Reg. 2501, Student Conduct & Honor Code) at 9–10.

[8]   For concision, Plaintiffs attach a single exemplar for each of the materially identical letters FIU sent them at different stages of the conduct process.

they fail to resubmit one if SCAI determines their original submission "does not adhere to the outlined instructions"), FIU will place a student conduct hold on their academic records, blocking them from class registration or obtaining financial aid, transcripts, a diploma, or other academic records. Ex. 14. FIU can also bring further student conduct actions for failure to complete the required video reflection. *Id.*

### C. Plaintiffs' Future Expressive Activities

ICEBreakers, including multiple Individual Plaintiffs, desire to engage in additional "expressive activities" as Regulation 110 defines that term in the upcoming 2026–27 academic year, and those that follow. Ex. 1 ¶ 9; Exs. 2–7 ¶ 17; Ex. 8 ¶ 16. Specifically, ICEBreakers and multiple Individual Plaintiffs plan to engage in protests and other expressive activities in indoor areas of the FIU campus to promote their message that FIU should end its relationship with ICE. Ex. 1 ¶¶ 9–10; Exs. 2–7 ¶ 18; Ex. 8 ¶ 17. At the start of the new academic year, ICEBreakers plans to engage in expressive activities indoors, including: wearing their "ICE OFF FIU" t-shirts and buttons together, posting flyers, tabling inside FIU's Graham Center to inform passing students about the 287(g) agreement and to convince them to join ICEBreakers' effort, and speaking to students and distributing flyers both inside and outside classrooms. Ex. 1 ¶ 11.

Plaintiffs and other ICEBreakers members fear that FIU will enforce its blanket ban on expressive activities indoors against them if they try to exercise their First Amendment rights. *Id.* ¶ 12; Exs. 2–7 ¶ 19; Ex. 8 ¶ 18. Plaintiffs and other ICEBreakers members are unable to determine what expressive activities would be permitted under Regulation 110 and what would be prohibited, including ICEBreakers' planned activities for the upcoming semester. Ex. 1 ¶ 13; Exs. 2–7 ¶ 20; Ex. 8 ¶ 19.

### LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs bear the burden of persuasion on each factor, and each is required for preliminary relief. *Id.*

"At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible for a permanent injunction, if the evidence is appropriate

given the character and objectives of the injunction proceeding." *Day v. Johnston*, 510 F. Supp. 3d 1296, 1299–300 (S.D. Fla. 2020) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)).

ARGUMENT

**A. Plaintiffs are substantially likely to prevail on the merits.**

**1. The punishment violates Plaintiffs' First Amendment rights.**

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). This principle applies with even greater force to university students, compared to children; the government has even less leeway to restrict protest and expression on university campuses. *Speech First*, 32 F.4th at 1128–29 (citing *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003), *Healy v. James*, 408 U.S. 169, 180 (1972), and *Sweezy v. New Hampshire*, 354 U.S. 234, 262 (1957) (Frankfurter, J., concurring)); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985) (recognizing that grade schools have special needs that require "the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult"); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967); *Pernell v. Fla. Bd. of Governors*, 181 F.4th 1135, 1144 (11th Cir. 2026). And Supreme Court and Eleventh Circuit decisions "leave no room for the view that, because of the acknowledged need for order [in state educational institutions,] First Amendment protections should apply with less force on college campuses than in the community at large." *Speech First*, 32 F.4th at 1127 n.6 (quoting *Healy*, 408 U.S. at 180) (alteration in original).

*Tinker* established the standard for balancing K-12 schoolchildren's speech rights with the government's interests in maintaining school discipline. A K-12 school may proscribe a student's free expression if the conduct, "in class or out of it . . . materially disrupts classwork or involves substantial disorder or invasion of the rights of others[.]" *Tinker*, 393 U.S. at 513. The Eleventh Circuit has found that *Tinker* protects silent protests in school. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1260, 1270 (11th Cir. 2004) (high school student's silently raising fist during flag salute instead of reciting Pledge of Allegiance was protected by the First Amendment "right to engage in non-disruptive expression in a classroom environment").

"[I]t's not at all clear that *Tinker*'s more lenient standard applies in the university—as opposed to the elementary- and secondary-school—setting." *Speech First*, 32 F.4th at 1127 n.6. Even assuming it does, Defendants' punishment of Plaintiffs' speech cannot be justified under

6

*Tinker*. Defendants do not claim that the students' speech disrupted the event or university operations. Instead, the university official in charge of the event agreed that the protest "did not disrupt the event, and the speakers were able to continue their discussion." Ex. 9. The university employee who charged the Individual Plaintiffs with violating Regulation 110(3) made clear that FIU was *not* accusing them of any disruptive conduct. Exs. 2–7 ¶ 15; Ex. 8 ¶ 14. Even if she had found some type of disruption, "student expression may not be suppressed simply because it gives rise to some slight, easily overlooked disruption," including "discussion and comment" or "hostile remarks[.]" *Holloman*, 370 F.3d at 1271–72 (quotations omitted). Plaintiffs' silent, short protest at a public event comes nowhere close to the "material disruption" and "substantial disorder" that *Tinker* requires. 393 U.S. at 513.

Regulation 110(3) itself is a prior restraint on "exercises of free speech" and assembly indoors, regardless of the potential for such exercises to disrupt the university. It therefore facially violates *Tinker*, as well as *Brown v. Louisiana*, 383 U.S. 131, 142 (1966), which held that the right to assemble specifically includes "the right in a peaceable and orderly manner to protest by silent and reproachful presence." FIU's rule makes no distinction between intimate classrooms, private offices, bustling hallways, and 700-person capacity auditoria. The rule is astoundingly broad in the speech it reaches. It prohibits "protests, parades, marches, picketing, demonstrations, and other similar expressive activities" "inside University buildings or other University indoor facilities." If that were not broad enough, Regulation 110 defines "expressive activities" as "activities such as assemblies, demonstrations, exercises of free speech, protests, parades, marches, and picketing protected under the First Amendment to the United States Constitution and Article 1 of the Florida Constitution." By its own terms, "activities . . . protected under the First Amendment" "are prohibited inside University buildings[.]" *Tinker* and its progeny forbid such a blanket prohibition. Indeed, Mary Beth Tinker's black armband would plainly violate Regulation 110(3) if worn indoors. Fifty-seven years ago, the Supreme Court made clear that grade school students can protest at school as long as they don't materially and substantially disrupt. FIU denies that freedom to its adult university and graduate students.

### 2. Regulation 110 is an unconstitutional content-based restriction.

Plaintiffs are also substantially likely to prevail on their argument that Regulation 110(3) is unconstitutional content discrimination. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the

government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "A governmental regulation of speech is content-based if it applies by its terms to speech 'because of the topic discussed' or if, even though facially neutral, it 'cannot be justified without reference to the content' of the speech." *Speech First*, 32 F.4th at 1126 (quoting *Reed*, 576 U.S. at 163–64). Put differently, "a regulation is content-based if it 'suppresses, disadvantages, or imposes differential burdens upon speech because of its content,'" that is, "if it draws 'facial distinctions defining regulated speech by particular subject matter.'" *Id.* (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994), and *Reed*, 576 U.S. at 163–64) (alterations in original omitted).

Although Regulation 110(3) purports that it "will be enforced in a content and viewpoint neutral manner," on its face it discriminates between forbidden "expressive activities," including protest-based speech specifically, and other permitted speech. One must refer to the speech's content to determine whether it falls into one or the other category. This is especially so because "commercial speech" is carved out of "expressive activities." Since commercial speech— "expression inextricably related to the economic interests of the speaker and audience," *Mason v. Fla. Bar*, 208 F.3d 952, 955 (11th Cir. 2000)—is not excluded from "expressive activities," Regulation 110(3) does *not* prohibit commercial speech in indoor areas of campus. Regulation 110 requires consideration of the content and viewpoint to determine its applicability to such expression, which inevitably leads to discriminatory enforcement.

### 3. Regulation 110 is unconstitutionally overbroad.

The overbreadth doctrine is "designed to prevent the chilling of protected expression." *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989). "A regulation that covers substantially more speech than the First Amendment allows is overbroad and thus invalid." *Speech First*, 32 F.4th at 1125; *see also Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (overbreadth when "a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." (quotations omitted)).

Regulation 110's categorical and sweeping nature has been detailed above. It prohibits *all indoor expressive activities*, and particularly includes "activities such as assemblies, demonstrations, exercises of free speech, protests, parades, marches, and picketing protected under the First Amendment to the United States Constitution and Article 1 of the Florida Constitution." That is "a regulation that covers substantially more speech than the First Amendment allows."

*Speech First*, 32 F.4th at 1125 ("The policy, in short, is staggeringly broad, and any number of statements—some of which are undoubtedly protected by the First Amendment—could qualify for prohibition under its sweeping standards.").

The restriction is so overbroad that it invites discriminatory or arbitrary enforcement. After all, many articles of clothing include expressive messages concerning a vast range of potentially controversial topics: commercial brands, sports teams, political subdivisions, electoral candidates, religious beliefs, and many more. Does Regulation 110 prohibit wearing clothing that expresses a particular view of any of these topics? Can you wear slogans advocating for boycotts of particular brands? Do you have to stand up while wearing that clothing for Regulation 110 to kick in? For how long? In certain rooms? During certain times? If you display another nation's flag, does it matter which nation? Can you wear the banned Haitian World Cup jersey to express Haitian pride and resistance to colonial oppression?[9] What about a t-shirt urging support for Donald Trump? Zohran Mamdani? Jair Bolsonaro? The overbreadth doctrine rejects this sort of line drawing: it falls upon those who seek to restrict free expression to narrowly tailor their regulations. *Cf. Minn. Voters All. v. Mansky*, 585 U.S. 1, 16–18 (2018) (discussing the "confusing line-drawing problems" inherent in a state's ban on "political" apparel, even in a nonpublic forum); *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574–75 (1987) (finding overbroad an airport's "sweeping ban" on all "First Amendment activities").

**B. Plaintiffs satisfy the remaining preliminary-injunction factors.**

When First Amendment rights are at stake, once a plaintiff shows a likelihood of success on the merits, "the remaining requirements necessarily follow." *Honeyfund.com, Inc. v. Governor of Fla.*, 94 F.4th 1272, 1283 (11th Cir. 2024). "[I]t is well established that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (alteration in original omitted). Here, the restriction on speech is explicit and severe, as is the punishment: a compelled video message and the threat of academic and financial sanctions. *See, e.g.*, *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 61 (2006) ("[F]reedom of speech prohibits the government from telling people what they must say."); *Otto*

---

[9]   Julia Gaffield, *FIFA's Haiti Jersey Ban Echoes the Long Campaign to Discredit and Downplay the Haitian Revolution*, The Conversation (June 15, 2026), https://theconversation.com/fifas-haiti-jersey-ban-echoes-the-long-campaign-to-discredit-and-downplay-the-haitian-revolution-285218.

*v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) ("Because the ordinances are an unconstitutional direct penalization of protected speech, continued enforcement, for even minimal periods of time, constitutes a per se irreparable injury." (quotation omitted)).

On the other side of the scale, "the government has 'no legitimate interest' in enforcing an unconstitutional law." *Honeyfund*, 94 F.4th at 1283 (quoting *KH Outdoor*, 458 F.3d at 1272). Because "it is in the public interest to protect First Amendment rights," *id.*, and "neither the State nor the public has a legitimate interest in the enforcement of an unconstitutional law," *Pernell*, 181 F.4th at 1166, the final preliminary-injunction factors are easily satisfied.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court preliminarily enjoin Defendants Nuñez and Duart, as well as their agents, from enforcing FIU Regulation 110(3) against Plaintiffs or other ICEBreakers members.[10]

Respectfully submitted August 11, 2026,

/s/ *Nicholas L.V. Warren*

Nicholas L.V. Warren (FBN 1019018)
Caroline A. McNamara (FBN 1038312)
Michelle Morton (FBN 81975)
Amy Godshall (FBN 1049803)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
cmcnamara@aclufl.org
mmorton@aclufl.org
agodshall@aclufl.org
dtilley@aclufl.org

Reid Levin (FBN 1038933)
**Reid Levin, PLLC**
P.O. Box 880682
Boca Raton, FL 33488

Adam C. Saper (FBN 111750)
Miriam Fahsi Haskell (FBN 69033)
Alana Greer (FBN 92423)
**Community Justice Project**
3000 Biscayne Boulevard, Suite 106
Miami, FL 33137
(305) 907-7697
adam@communityjusticeproject.com
miriam@communityjusticeproject.com
alana@communityjusticeproject.com

James Slater (FBN 111779)
**Slater Legal PLLC**
9000 Dadeland Boulevard, Suite 1500
Miami, FL 33156
(305) 523-9023
james@slater.legal

---

[10]   Plaintiffs request that the Court require no bond, or only a nominal one. *See Towbin v. Antonacci*, 885 F. Supp. 2d 1274, 1295 (S.D. Fla. 2012) (requiring no bond and noting that "the Eleventh Circuit has held that 'the court may elect to require no security at all'" (quoting *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, 425 F.3d 964, 971 (11th Cir. 2005))).

(561) 866-6089
reid@reidlevinpllc.com

*Counsel for Plaintiffs*