**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:26-cv-25395

ICEBREAKERS, *et al.*,

*Plaintiffs*,

v.

JEANETTE NUÑEZ, *et al.*,

*Defendants*.
_________________________________/

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

While FIU dutifully nods to the notion that "free expression is a valuable part of its mission," Response at 2,[1] it continues to spend a significant amount of university resources to punish a small group of students for their peaceful, silent protest. Rather than celebrate Plaintiffs' engagement as part of the respectful kind of interaction that should be valorized, FIU clamped down. Yet "[e]ducation should not be intended to make people comfortable, it is meant to make them think. Universities should be expected to provide the conditions within which hard thought, and therefore strong disagreement, independent judgment, and the questioning of stubborn assumptions, can flourish in an environment of the greatest freedom." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1129 (11th Cir. 2022) (Marcus, J., concurring) (quotation omitted). "A university that has placed its highest premium on the protection of feelings or safe intellectual space has abandoned its core mission." *Id.*

Besides failing in this aspect of its mission, FIU fails on the law as well. FIU succeeds in propping up and batting down various strawmen, like "*Tinker* doesn't require a university to let students disrupt and co-opt university functions on demand," Response at 13. But FIU's own video evidence, which displays an entirely civil, almost banal, act of silent expression, demonstrates how nondisruptive Plaintiffs' protest was. Ultimately, at nearly every turn, FIU's maximalist reading of the precedent it cites necessarily implies that *Tinker* is incorrect, which of course this Court cannot hold. Because *Tinker* is not so easily tossed aside, the Court should grant Plaintiffs' motion.

## I. *Tinker* provides the baseline standard.

FIU spills much ink implicitly addressing a question not before the Court: what standard governs when a member of the *public*—as opposed to an FIU student—has a right to engage in expression in FIU's various buildings. That circumstance would indeed require the extended forum

[1] Plaintiffs cite to the ECF pagination.

analysis that FIU proposes. *See, e.g.*, *Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011) (conducting forum analysis in preacher's challenge to university policy restricting outside, non-sponsored speakers from campus; citing *Tinker* only in passing*)*; *Moms for Liberty v. Brevard Pub. Schs.*, 118 F.4th 1324, 1331 (11th Cir. 2024) (applying forum analysis to parents' challenge to school board's rules against "abusive," "personally directed," and "obscene" speech at board meetings; not citing *Tinker*). Forum analysis makes sense in those cases concerning non-students. Where the case concerns *student* speech on campus, though, *Tinker* is the constitutional floor.

Five Supreme Court cases establish standards governing student speech: *Tinker* (speech causing a material and substantial disruption), *Fraser* (lewd speech), *Kuhlmeier* (school-sponsored speech), *Morse* (speech promoting illegal drug use), and *Mahanoy* (off-campus speech).[2] None require the forum analysis that FIU demands. Neither *Tinker* nor *Fraser* contains the word "forum" at all. Similarly, neither *Morse* nor *Mahanoy* conducts a forum analysis—the word "forum" appears only once in *Mahanoy*, to quote the word's sole appearance in *Morse*, which was itself a quote to *Kuhlmeier*. And *Kuhlmeier* conducted the analysis only for the purpose of creating a bespoke rule for the unique context of speech *sponsored by the school*, which is not at issue here.

This student-speech framework, with *Tinker* as the baseline, provides the doctrinal floor for this Court's ultimate decision—not any other line of cases. *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001) (Alito, J.) ("To summarize: Under *Fraser*, a school may categorically prohibit lewd, vulgar or profane language. Under [*Kuhlmeier*], a school may regulate school-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern. Speech falling outside of these

---

[2] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); *Morse v. Frederick*, 551 U.S. 393 (2007); *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180 (2021).

categories is subject to *Tinker*'s general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others."). And because this case does not involve lewd speech (*Fraser*), school-sponsored speech (*Kuhlmeier*), drug-related speech (*Morse*), or off-campus speech (*Mahanoy*), the speech at issue "is subject to *Tinker*'s general rule." *Id.*[3] If there was no "substantial disruption of or material interference with school activities," *Tinker*, 393 U.S. at 514, the discipline at issue here was unconstitutional.

Circuit precedent further supports this approach. A number of Eleventh Circuit student-speech cases cite *Tinker* without even mentioning the word "forum." *E.g.*, *Speech First*, 32 F.4th 1110 (students challenged university's "discriminatory-harassment" and "bias-related-incidents" policies); *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978 (11th Cir. 2007) (high school punished student for writing about "dream" of shooting teacher); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1273 (11th Cir. 2004) (high school punished student for silently raising fist during Pledge of Allegiance; citing *Tinker* throughout while only mentioning "forum" once in string cite concerning viewpoint discrimination). And while forum analysis was discussed in *Bannon v. School District of Palm Beach County*, it, like *Kuhlmeier*, concerned *school-sponsored* speech. 387 F.3d 1208 (11th Cir. 2004). *Bannon* discusses forum analysis along the way, providing a theoretical framework for the doctrine before getting to the critical upshot: student speech is

[3] To be sure, *Tinker* is only the baseline (and not all of the additional student-speech standards govern at the college level). As the Eleventh Circuit has noted, "it's not at all clear that *Tinker*'s more lenient standard applies in the university—as opposed to the elementary- and secondary-school—setting." *Speech First*, 32 F.4th at 1127 n.6. The necessary implication is that if *Tinker*'s "more lenient" (to the university) standard doesn't apply, a standard more permissive *for the students* applies—not a forum analysis yielding (according to FIU) *fewer* First Amendment freedoms than kindergarteners have. *Accord McCauley v. Univ. of Virgin Islands*, 618 F.3d 232, 242–43 (3d Cir. 2010); *DeJohn v. Temple Univ.*, 537 F.3d 301, 316–20 (3d Cir. 2008) (recognizing that "public secondary and elementary school administrators are granted more leeway to restrict speech than public colleges and universities" (cleaned up)).

different. Or, as *Bannon* put it: "In school settings, however, the analysis is slightly more refined based on the identity of the speaker and the nature of the expression." *Id.* at 1213 (describing the relevant categories). Of the four categories of speech *Bannon* described as applying to school settings, *Tinker* is the one that applies here.

FIU's presentation obscures, rather than illuminates, these principles. The way FIU's Response is structured, one might assume a court must conduct a forum analysis at Step One and then apply the "more refined analysis" for school settings at Step Two. *See* Response at 6–9. But that's not how the Supreme Court applies student-speech doctrine; the doctrinal baseline—and constitutional floor—is *Tinker*.

The cases FIU cites do not counsel a different result. *Healy v. James* concerned four asserted bases for a school's refusal to recognize a Students for a Democratic Society chapter. 408 U.S. 169 (1972). The Court rejected three of the bases but found that the club's "equivocation regarding how it might respond to 'issues of violence' and whether it could ever 'envision . . . interrupting a class'" suggested an "unwillingness to be bound by reasonable school rules governing conduct," specifically the college's "explicit statement with respect to campus disruption." *Id.* at 191. But the Court made clear that the line between protected "advocacy" ("entitled to full protection") and unprotected "action" (subject to time, place, and manner restrictions) was the *Tinker* line. *Id.* at 189–90, 192–93 ("The line between permissible speech and impermissible conduct tracks the constitutional requirement, and if there were an evidential basis to support the conclusion that CCSC-SDS posed a substantial threat of material disruption in violation of that command the President's decision should be affirmed. The record, however, offers no substantial basis for that conclusion." (footnote omitted)). "[T]ime, place, or type of behavior" restrictions are proper only where conduct would already violate *Tinker*. 393 U.S. at 513.

FIU also leans heavily on the former Fifth Circuit's reference to "order and decorum within the educational system." Response at 6, 9, 11 (citing *Holloman*, 370 F.3d at 1271 (quoting *Burnside v. Byars*, 363 F.2d 744, 748 (5th Cir. 1966))). Broad statements of deference don't go very far here, as any considerations of deference are already baked into the doctrine itself. *Burnside* pre-dated *Tinker* and was in fact cited repeatedly in *Tinker* itself, meaning any concerns that *Burnside* had about when deference was appropriate were incorporated into *Tinker*'s rule. And, perhaps most notably, *Tinker*'s material-and-substantial-disruption standard itself comes from *Burnside*. 363 F.2d at 749 ("[Schools] cannot infringe on their students' right to free and unrestricted expression . . . , where the exercise of such rights in the school buildings and school rooms do not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school."). Material and substantial disruption remains the standard, not an abstract reference to "order." *Accord Boim*, 494 F.3d at 983 (quoting *Holloman* for its reference to "order" in *Burnside* while also quoting *Holloman* for the proposition that "student speech must at least be likely to cause a material and substantial disruption, and more than a brief, easily overlooked, *de minimis* impact, before it may be curtailed" (cleaned up)).[4]

**II. FIU's policy and punishment of Plaintiffs violate their First Amendment rights.**

**A. FIU fails the *Tinker* standard.**

Where *Tinker* applies, it requires a "substantial disruption of or material interference with school activities" before speech can be punished. 393 U.S. at 514. Here, the FIU official in charge

---

[4] It is in part for this reason that FIU's citation to *Sword v. Fox*, 446 F.2d 1091 (4th Cir. 1971), is unpersuasive. *Sword*'s reference to "order and decorum," *id.* at 1098, is no more doctrinally significant than *Burnside*'s. And although *Sword* referenced "demonstrations," it did not address protests more broadly. To the extent that "demonstrations" means the type of silent, non-disruptive protest in which Plaintiffs engaged, *Sword* would imply that *Tinker* itself was wrongly decided. Similarly, the indoor/outdoor distinction that *Sword* and FIU draw upon makes no sense under *Tinker*, because that would also justify restricting the *Tinker* students' classroom speech.

of the event agreed that the protest "did not disrupt the event, and the speakers were able to continue their discussion." ECF No. 4-9 at 1. And the FIU employee who charged Plaintiffs with violating Regulation 110(3) made clear that FIU was *not* accusing them of any disruptive conduct. ECF Nos. 4-2 through 4-7 ¶ 15; ECF No. 4-8 ¶ 14. That is enough to find for Plaintiffs.

Further review of the evidence confirms this. FIU helpfully submits body-cam footage demonstrating this point.[5] In that footage (Ex. C), which becomes unobstructed around 26 seconds in, we see one minute and twelve seconds of the students standing silently and respectfully, without making vulgar gestures or gesticulating in any way. While a few audience members look around, the vast majority continue to pay attention to the speakers, which is apparent because the audience laughs jovially at a joke shared by the participants on stage, and the discussion continues good-naturedly forward. Nothing about this footage in the slightest suggests a "substantial disruption of or material interference with school activities," *Tinker*, 393 U.S. at 514.

Although, as noted above, the university official in charge of the event disclaimed any disruption, FIU now submits a declaration by a campus police officer, who shared that, "[f]rom [his] perspective, as someone in the room, the standing attendees disrupted the event, both by obstructing other audience members' view of the event and by causing a distraction when they stood up together and left the auditorium all at the same time." ECF No. 14-4 at 3. This declaration is belied by the footage, which shows no audience member straining to see around the students, and transparently fails to show any significant distraction, much less disruption.

Even ignoring the exculpatory footage, the declaration fails to move the needle. The legal question is not whether "the standing attendees disrupted the event" or "caus[ed] a distraction,"

[5] FIU refused Plaintiffs' repeated requests for a copy of this footage during and after the disciplinary process.

ECF No. 14-4 at 3. "Disruption" or "distraction" alone are not enough. *Doe v. Univ. of Mass.*, 145 F.4th 158, 172 (1st Cir. 2025) ("Recall that in *Mahanoy*, the speech at issue 'upset' other students and interrupted a math class on 'a couple of days' for up to '5 to 10' minutes per day. And in *Tinker*, . . . the student conduct 'wrecked' a class and 'took the students' minds off their classwork.' But in both cases the evidence was insufficient to demonstrate a substantial disruption that could justify the schools' speech restrictions." (citations omitted)). Instead, the question is whether there was a "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. The answer is no. Indeed, there is nothing in the record that indicates Plaintiffs' display materially disrupted any student's ability to complete their classwork. *See id.* at 513. There is no evidence that Plaintiffs' silent demonstration caused "substantial disorder or invasion of the rights of others." *Id.* And "there were no threats or acts of violence on school premises." *Id.*[6]

Absent any evidence that Plaintiffs *materially* and *substantially* disrupted FIU's event, and in the face of compelling evidence from FIU officials explicitly disclaiming any such disruption, the punishment squarely fails *Tinker* and was thus unconstitutional.

---

[6] FIU's argument suggests it shares the *Holloman* dissent's view of disruption, but of course the *Holloman* majority rejected that. *Holloman*, 370 F.3d at 1272 ("The dissent concludes that Holloman's gesture was unprotected because 'the students' comments to [the teacher] after class demonstrate that they at least focused their attention during a portion of the recitation of the Pledge on Holloman's fist ... rather than on the planned curriculum of saying the Pledge.' This approach appears to ignore the principle discussed above that student expression must cause (or be likely to cause) a 'material and substantial' disruption, *Burnside,* 363 F.2d at 749, and more than a brief, easily overlooked, *de minimis* impact, before it may be curtailed. The dissent argues that Holloman's act was 'meant to compete for students' attention.' The same can be said of any of the forms of student expression that have been found to be protected, including the wearing of armbands or buttons in class. A student expressing himself in those ways clearly intends to attract the other students' attention and have them consider, however briefly, the meaning behind the symbolism. Indeed, if a student's attention is never focused, if even for a moment, on the expression, it becomes pointless. Under the dissent's approach, where schools may prohibit any speech or acts that do anything to distract a student's mind—however briefly or insubstantially—from the planned curriculum, constitutional protection for student expression by definition would be eliminated." (alterations in original omitted)).

**B. FIU's policy and punishment fail any forum analysis.**

Even if a forum analysis were applied, the result would be the same. In a limited public forum, a speech restriction must be viewpoint neutral and "must be reasonable in light of the purpose served by the forum." *Moms for Liberty*, 118 F.4th at 1331 (quotations omitted). In contrast to the viewpoint-neutrality prong, "[t]he reasonableness inquiry, on the other hand, is more flexible and context specific, and will depend on the nature and purpose of the forum." *Id.* at 1332. "[S]uch purpose-based restrictions must be wholly consistent with the government's legitimate interest in preserving the property for the use to which it is lawfully dedicated, and prohibited speech must be naturally incompatible with the purposes of the forum." *Id.* (cleaned up). "So what is reasonable in one forum may not be reasonable in another. The purpose of a university, for example, is strikingly different from that of a public park." *Id.* (cleaned up).

Strikingly different indeed. Here, particularly in light of the forum's purpose, it is unreasonable to enforce a rule that reaches silent, non-disruptive expression. *See also Brown v. Louisiana*, 383 U.S. 131 (1966) (overturning breach-of-the-peace convictions for five individuals who entered "small room" in library and protested against racial segregation for 10–15 minutes).

**C. Regulation 110 is an unconstitutional content-based restriction.**

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163–64.

Here, the law is content-based for several independent reasons. *First*, Regulation 110 is content-based because it "defin[es] regulated speech by its function or purpose." *Id.* at 163. It explicitly targets speech because of its expressive purpose. What would distinguish a group of students lining up in the hallway to use the restroom (not punishable under Regulation 110) from a similar group of students in the same location lining up wearing "ICE OFF FIU" shirts (evidently punishable under Regulation 110)? The latter group is expressing a message of protest. *Second*, Regulation 110 is content-based because it divides permissible expressive activities into subcategories. Here, the indoor/outdoor distinction for regulating expressive activities hurts, rather than helps, FIU. By tying the outdoor expressive-activities rule to *Tinker* while creating a different rule for indoors—only for a subset of protest-specific expression, and even for expression that doesn't cause material and substantial disruption—FIU creates a content-based subdivision that triggers strict scrutiny. *See Scott v. City of Daytona Beach*, --- F.4th ----, No. 24-12662, 2026 WL 1830927, at *12 (11th Cir. June 25, 2026) ("[A] rule that restricts 'solicitation' may be content-neutral—but only if it regulates categorically and evenhandedly. A rule that discriminates among subcategories of solicitation—say, by applying different rules to requests for commercial and charitable donations—loses its claim to content-neutrality." (cleaned up)). *Third*, even though commercial speech is defined elsewhere, one must still examine the communicative nature of the speech to understand whether it triggers Regulation 110's commercial-speech exclusion, triggers the protest-based indoor-expression restriction, or neither. *Cf. id.* (law content-neutral if content examined for "a *non-speech* consideration" (emphasis added)).

For these reasons, the regulation is content-based.[7] It then triggers, and quickly fails, strict

---

[7] *Tinker* avoids content-based discipline by focusing on impact ("substantial disruption of or material interference with school activities," 393 U.S. at 514), regardless of the content expressed.

scrutiny, for the reasons it also fails under *Tinker* and ordinary forum analysis.

**D. Regulation 110 is overbroad.**

Though the indoor-expression ban may not cover all expressive activities, Response at 14, that does not save the ban from overbreadth. *Tinker* is the constitutional floor, yet the indoor-expression ban prohibits a tremendous amount of expression that would otherwise be permissible. This is so because while the outdoor regulation incorporates *Tinker*, the indoor regulation does not. And this case makes all the more clear that FIU intends to punish speech well beyond what *Tinker* allows. Under Regulation 110, any indoor activity that FIU deems a protest—presumably including the *Tinker* students' protest—is punishable. And that facial interpretation of the policy holds even if Plaintiffs' speech had been materially and substantially disruptive (contrary to the evidence). Because the regulation encompasses any expression that FIU deems to concern "protest"—including silent, non-disruptive speech—it punishes a substantial amount of protected speech judged in relation to its otherwise legitimate sweep.[8]

* * *

For these reasons, Plaintiffs respectfully request that the Court grant their motion.[9]

Respectfully submitted August 19, 2026,

/s/ Daniel B. Tilley
Nicholas L.V. Warren (FBN 1019018)
Caroline A. McNamara (FBN 1038312)
Michelle Morton (FBN 81975)
Adam C. Saper (FBN 111750)
Miriam Fahsi Haskell (FBN 69033)
Alana Greer (FBN 92423)

---

[8] As a case about silent, non-disruptive student protest at their university, Plaintiffs' case is a far cry from the January 6 protester's case concerning access to the U.S. Capitol. Response at 11–12 (citing *United States v. Nassif*, 97 F.4th 968 (D.C. Cir. 2024)). Each forum's purpose, and the appropriate bases for restricting access to them, are starkly different. For the reasons noted above, the university setting is unique, and whether *Tinker*, a more student-friendly standard, or forum analysis applies, the legitimate sweep of restrictions at a university is entirely different from those at the national capitol. Again, taking FIU at its word, its interpretation of *Nassif* would mean *Tinker* itself was wrongly decided.

[9] Because FIU only addressed the likelihood-of-success prong in its Response, it has waived any arguments concerning the other factors and the bond.

Amy Godshall (FBN 1049803)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
cmcnamara@aclufl.org
mmorton@aclufl.org
agodshall@aclufl.org
dtilley@aclufl.org

Reid Levin (FBN 1038933)
**Reid Levin, PLLC**
P.O. Box 880682
Boca Raton, FL 33488
(561) 866-6089
reid@reidlevinpllc.com

**Community Justice Project**
3000 Biscayne Boulevard, Suite 106
Miami, FL 33137
(305) 907-7697
adam@communityjusticeproject.com
miriam@communityjusticeproject.com
alana@communityjusticeproject.com

James Slater (FBN 111779)
**Slater Legal PLLC**
9000 Dadeland Boulevard, Suite 1500
Miami, FL 33156
(305) 523-9023
james@slater.legal

*Counsel for Plaintiffs*