**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 26-cv-25395-JB

ICEBREAKERS, *et al.*,

*Plaintiffs*,

v.

JEANETTE NUÑEZ, *et al.*,

*Defendants*.

_______________________________________/

# PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

FIU used its student conduct code to discipline seven ICEBreakers members for engaging in brief, silent, peaceful protest during a public campus event in March 2026. Defendants imposed this discipline despite sixty years of precedent making clear that schools cannot punish students for expressive conduct unless it "materially and substantially disrupt[s] the work and discipline of the school" or "involves substantial disorder or invasion of the rights of others." *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969); Dkt. No. 20 (PI Order) at 5. Defendants spent months investigating and holding disciplinary hearings, during which the students repeatedly reminded Defendants that clear federal law precluded their discipline; but Defendants punished them anyway. Plaintiffs sued, all Defendants moved to dismiss for failure to state a claim, and the Individual Defendants assert the defense of qualified immunity. Dkt. No. 24 (Motion). For the reasons stated below, the Motion should be denied.

## FACTUAL BACKGROUND

On April 10, 2025, the federal government revoked 29 international student visas for Florida university students; eighteen were enrolled at FIU. Dkt. No. 1 (Compl.) ¶ 25. The very next day, FIU became the first university or college nationwide to volunteer its campus police for federal immigration enforcement duties through ICE's 287(g) program. *Id.* ¶¶ 2, 26–28. ICE executed and

finalized its 287(g) agreement with FIU on July 7, 2025. *Id.* ¶ 30. In response to this unprecedented intrusion into their campus life, FIU students, faculty, and other members of the university community have spoken out and taken actions to protest both the federal government's anti-immigrant policies and the university's complicity. *Id.* ¶ 3. In particular, a student-led coalition called ICEBreakers has mobilized students, faculty, and others to end FIU's partnership with ICE. *Id.* ¶¶ 4, 9, 35–36.

One ICEBreakers protest took place on March 13, 2026, at a university event featuring FIU President Nuñez and baseball player Alex "A-Rod" Rodriguez. *Id.* ¶ 37. This public event was held at FIU's Student Academic Success Center, a large auditorium with a capacity of 700 people, as part of FIU's Presidential Speaker Series. *Id.* Several ICEBreakers members, including the Individual Plaintiffs, engaged in a silent, peaceful protest during the event by standing up, briefly facing the audience, and then walking out. *Id.* ¶¶ 38–39. President Nuñez and A-Rod continued their conversation unabated during and after Plaintiffs' protest. *Id.* ¶ 40. The protest neither materially nor substantially disrupted the event or university operations. *Id.* ¶¶ 41–44. In fact, the university staff member who oversaw the event confirmed that the protest "did not disrupt the event, and the speakers were able to continue their discussion." *Id.* ¶¶ 47–48. Further, she stressed that "[n]o other attendees approached [her] directly to raise concerns about the incident." *Id.* ¶ 48.

One of FIU's policies governing student conduct is Regulation 110, "Expressive Activities in Outdoor Areas on Campus." *Id.* ¶¶ 49, 51. Section 3 of Regulation 110 provides that "protests, parades, marches, picketing, demonstrations, and other similar expressive activities are prohibited inside University buildings or other University indoor facilities." *Id.* ¶ 51. Regulation 110 defines "expressive activities" as "activities such as assemblies, demonstrations, exercises of free speech, protests, parades, marches, and picketing *protected under the First Amendment to the United States*

*Constitution and Article 1 of the Florida Constitution*." *Id.* ¶ 52 (emphasis added).

FIU's Office of Student Conduct & Academic Integrity (SCAI) investigated Plaintiffs' silent protest throughout April and May, held information sessions with each Individual Plaintiff, and eventually charged them with misconduct for failing to comply with Regulation 110(3) based on their silent protest. *Id.* ¶¶ 45–50, 53–56. The SCAI official who charged the students stressed that she was *not* charging them with disruptive conduct—a separate student conduct violation that parrots the *Tinker* standard and prohibits "[b]ehavior that substantially and materially disrupts, disturbs, impairs, interferes with or obstructs the orderly conduct, process and functions of the University or the rights of other members of the University community"—because that was not supported by her investigation. *Id.* ¶¶ 54–57.

Following their information sessions, the Individual Plaintiffs each sent Defendant Amelia Rodriguez a request for information regarding SCAI's awareness of *Tinker*, whether SCAI had communicated with the University's Office of General Counsel about *Tinker*, and whether SCAI would request an advisory opinion on whether the conduct is constitutionally protected under *Tinker*. *Id.* ¶ 58. Defendant Rodriguez responded to the Individual Plaintiffs in letters that "any legal questions should be directed to University Counsel, Ryan Kelley[.]" *Id.* ¶ 59. So, the students sent Mr. Kelley a warning of legal liability that included multiple judicial decisions, including *Tinker*, *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004), *Hatcher ex rel. Hatcher v. DeSoto County School District*, 939 F. Supp. 2d 1232 (M.D. Fla. 2013), and *Gillman ex rel. Gillman v. School Board for Holmes County*, 567 F. Supp. 2d 1359 (N.D. Fla. 2008). Compl. ¶ 60.

Instead of heeding these clear legal warnings, Defendant Rodriguez set a misconduct hearing for six of the Individual Plaintiffs (all but Plaintiff Kuhlman, whose hearing is yet to be

scheduled), with Defendant Parra serving as hearing officer. *Id.* ¶¶ 61–64. At the hearing, the students highlighted the same cases and argued the clearly established legal principle that disciplining students for peaceful, non-disruptive political expression is unconstitutional. *See id.* ¶ 64. Nonetheless, Defendant Parra ignored established precedent and found all six responsible for the misconduct charged. *Id.* ¶ 65. Defendant Parra imposed a written reprimand and a "video reflection" requiring each student to "explain[] your understanding of FIU Regulation 110, what is expected under FIU Regulation 110 related to indoor and outdoor areas, and how you will apply what you have learned moving forward." *Id.* ¶¶ 66–67.

The six disciplined students filed an appeal, which was assigned to Defendant Hamilton. *Id.* ¶ 68. The appeal also cited the cases previously ignored by Mr. Kelley, Defendant Rodriguez, and Defendant Parra. *See id.* Defendant Hamilton too disregarded existing law, denied the students' subsequent appeals, and upheld the sanctions imposed by Defendant Parra. *See id.* ¶ 68. Defendants warned the Individual Plaintiffs that their failure to submit an acceptable "video reflection" would result in a "student conduct hold" on their academic records as well as the threat of further student conduct actions. *Id.* ¶ 69.

Plaintiffs sought a preliminary injunction against Defendants Nuñez and Duart to block the imposed discipline and prevent future enforcement of Regulation 110(3) against them. Dkt. No. 4. The Court entered the requested preliminary injunction on August 23, 2026. Dkt. No. 20.

## LEGAL STANDARD

In reviewing a 12(b)(6) motion to dismiss, "the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff." *Speaker v. CDC*, 623 F.3d 1371, 1379 (11th Cir. 2010). To avoid dismissal, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). It "need not contain 'detailed factual allegations'"; rather, the allegations must only "'raise a right to relief above the speculative level.'" *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## ARGUMENT

### I. Plaintiffs plausibly allege violations of their First Amendment rights.

Plaintiffs assert one claim under 42 U.S.C. § 1983. Compl. ¶¶ 76–92. The Complaint alleges that Defendants violated the First Amendment by punishing the Individual Plaintiffs for a silent, peaceful, non-disruptive protest during a public event on their campus. *Id.* ¶¶ 37–69. Defendants' continued enforcement of Regulation 110(3) chills the speech of ICEBreakers student members who plan further protests. *Id.* ¶¶ 70–75. That is enough to plausibly state a claim for relief and to overcome a motion to dismiss. *See Speaker*, 623 F.3d at 1379 (requiring Plaintiffs' allegation to be taken as true for purposes of resolving the Motion); *Holloman*, 370 F.3d at 1260, 1269–70 (holding high school student's silently raising fist during flag salute instead of reciting Pledge of Allegiance was protected by the First Amendment "right to engage in non-disruptive expression in a classroom environment"). Defendants' Motion should be denied.

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. This principle applies with even greater force to university students, compared to children; the government has even less leeway to restrict protest and expression on university campuses. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128–29 (11th Cir. 2022) (citing *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003), *Healy v. James*, 408 U.S. 169, 180 (1972), and *Sweezy v. New Hampshire*, 354 U.S. 234, 262 (1957) (Frankfurter, J., concurring)); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985) (recognizing that grade

schools have special needs that require "the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult"). And Supreme Court and Eleventh Circuit decisions "leave no room for the view that, because of the acknowledged need for order [in state educational institutions,] First Amendment protections should apply with less force on college campuses than in the community at large." *Speech First*, 32 F.4th at 1127 n.6 (quoting *Healy*, 408 U.S. at 180) (alteration in original).

*Tinker* established the standard for balancing K-12 schoolchildren's speech rights with the government's interests in maintaining school discipline. A K-12 school may proscribe a student's free expression if the conduct, "in class or out of it . . . materially disrupts classwork or involves substantial disorder or invasion of the rights of others[.]" *Tinker*, 393 U.S. at 513. "[I]t's not at all clear that *Tinker*'s more lenient standard applies in the university—as opposed to the elementary- and secondary-school—setting." *Speech First*, 32 F.4th at 1127 n.6. Even assuming it does, Defendants' punishment of Plaintiffs' speech cannot be justified under *Tinker*.

Indeed, Defendants do not claim that the students' speech substantially or materially disrupted the event or university operations. Instead, the university official in charge of the event agreed that the protest "did not disrupt the event, and the speakers were able to continue their discussion." Compl. ¶ 48. Defendant Rodriguez made clear that FIU was *not* accusing them of any disruptive conduct. *Id.* ¶¶ 53–56. Even if she had found some type of disruption, "student expression may not be suppressed simply because it gives rise to some slight, easily overlooked disruption," including "discussion and comment" or "hostile remarks[.]" *Holloman*, 370 F.3d at 1271–72 (quotations omitted). Plaintiffs' silent, short protest at a public event comes nowhere close to the "material and substantial" degree that *Tinker* requires. 393 U.S. at 511.

Regulation 110(3) itself is a prior restraint on "exercises of free speech" and assembly

indoors, regardless of the potential for such exercises to disrupt the university. It therefore facially violates *Tinker*. *See also Brown v. Louisiana*, 383 U.S. 131, 142 (1966) (holding that right to assemble specifically includes "the right in a peaceable and orderly manner to protest by silent and reproachful presence"). FIU's rule makes no distinction between intimate classrooms, private offices, bustling hallways, and 700-person capacity auditoria. The rule is astoundingly broad in the speech it reaches. It prohibits "protests, parades, marches, picketing, demonstrations, and other similar expressive activities" "inside University buildings or other University indoor facilities." Compl. ¶ 51. If that were not broad enough, Regulation 110 defines "expressive activities" as "activities such as assemblies, demonstrations, exercises of free speech, protests, parades, marches, and picketing protected under the First Amendment to the United States Constitution and Article 1 of the Florida Constitution." *Id.* ¶ 52. By its own terms, "activities . . . protected under the First Amendment" "are prohibited inside University buildings[.]" *Id.* ¶¶ 51–52. *Tinker* and its progeny forbid such a blanket prohibition. Indeed, Mary Beth Tinker's black armband would plainly violate Regulation 110(3) if worn indoors. Fifty-seven years ago, the Supreme Court made clear that grade school students can protest at school so long as they don't materially and substantially disrupt. *Tinker*, 393 U.S. at 513. FIU denies that freedom to its adult university and graduate students.

Defendants try to obscure their clear constitutional violations by arguing that universities are allowed to enact content-neutral time, place, and manner restrictions on campus. But the cases they cite—*Healy v. James*, 408 U.S. 169 (1972), and *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667 (1973)—explicitly acknowledge *Tinker*'s limitations on student discipline and do nothing to alter the "material and substantial disruption" standard that *Tinker* clearly established. *See, e.g.*, *Healy*, 408 U.S. at 189–90, 192–93 ("The line between permissible speech and impermissible conduct tracks the constitutional requirement, and if there were an

evidential basis to support the conclusion that CCSC-SDS posed a substantial threat of material disruption in violation of that command the President's decision should be affirmed. The record, however, offers no substantial basis for that conclusion." (footnote omitted)). "[T]ime, place, or type of behavior" restrictions are proper only where conduct would already violate *Tinker*. 393 U.S. at 513.

Defendants' other citations fare no better. *Bar-Navon v. Brevard County School Board*, 290 F. App'x 273 (11th Cir. 2008), is an unpublished affirmance of a district court opinion denying a high school student's First Amendment claim to wear lip piercings in class. The published decision *Bar-Navon* cites, *Scott v. School Board of Alachua County*, holds that a high school can permissibly ban displays of the Confederate flag on campus because such displays are reasonably likely to cause material disruption. 324 F.3d 1246, 1248–49 (11th Cir. 2003). And even when district courts evaluate content-neutral time, place, and manner restrictions on campus without explicitly citing *Tinker*, they still recognize that campus "[r]egulations are not immune from constitutional attack merely because they unreasonably restrict with an even hand all speech or all demonstrations." *Auburn All. for Peace & Justice v. Martin*, 684 F. Supp. 1072, 1076 (M.D. Ala. 1988). That district courts may have upheld other, more narrowly tailored restrictions on campus expressive activities does nothing to prevent FIU's enforcement of Regulation 110(3) against Plaintiffs from crashing headlong into *Tinker's* clearly established protections.

Fundamentally, Regulation 110(3) is incompatible with *Tinker* and the larger First Amendment doctrine in the university context. By banning "protests, parades, marches, picketing, demonstrations, and other similar expressive activities" "inside University buildings or other University indoor facilities," Compl. ¶ 51, Regulation 110(3) ignores the varying times, places, and manners such expression could take place across a wide range of campus buildings, from

libraries to dining halls to dormitories to offices to public auditoria. It specifically targets protected expressive activity based on its content and "defin[es] regulated speech by its function or purpose." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). And while *Tinker* provides the constitutional floor, the indoor-expression ban is unconstitutionally overbroad because it prohibits a tremendous amount of expression that would otherwise be permissible. Under Regulation 110, any indoor activity that FIU deems a protest is punishable. Because the regulation encompasses any expression that FIU deems to concern "protest"—including silent, non-disruptive speech—it punishes a substantial amount of protected speech judged in relation to its otherwise legitimate sweep.

## II. The Individual Defendants are not entitled to qualified immunity.

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1323 (11th Cir. 2024) (quotation omitted). It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)). However, qualified immunity is "not automatic," and the defendant bears the "burden of raising the defense of qualified immunity by proving that he was acting within his authority[.]" *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018). Once an official proves that they were acting within their authority,[1] the burden shifts to the plaintiff to demonstrate "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged

---

[1] The Individual Defendants here assert that they were acting within the scope of their discretionary authority, Motion at 12, and Plaintiffs agree.

conduct." *Jarrard*, 115 F.4th at 1323 (quotation omitted).

Although the Eleventh Circuit previously required precedential cases with "materially similar" facts, the Supreme Court rejected such a "rigid gloss on the qualified immunity standard[.]" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1185 (11th Cir. 2009) ("There need not, however, be a prior case wherein 'the very action in question has previously been held unlawful.'" (quoting *Hope*, 536 U.S. at 741)). While "clearly established law should not be defined at a high level of generality," a "case directly on point" is not required. *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curium) (citations omitted). Instead, the "salient question" is "whether the state of the law" gave the defendant "fair warning" that the action was unconstitutional. *Hope*, 536 U.S. at 741.

There are three ways to establish that a defendant had "fair warning": (1) "a materially similar case has already been decided"; (2) there exists "a broader, clearly established principle that should control the novel facts of the situation"; or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (quoting *Terrell v. Smith*, 668 F.3d 1244, 1255–56 (11th Cir. 2012)).

The Individual Defendants knew that *Tinker* and many subsequent precedents preclude student discipline unless it "materially and substantially disrupt[s] the work and discipline of the school" or "involves substantial disorder or invasion of the rights of others." 393 U.S. at 513; PI Order at 5. As this Court explained when granting the preliminary injunction, "sixty years of First Amendment precedent support Plaintiffs' position" that Defendants imposed unconstitutional discipline on the Individual Plaintiffs. PI Order at 2. Even if Defendants were initially ignorant of this longstanding precedent, the protracted disciplinary process provided ample opportunity for

the Individual Defendants to become compliant with precedent and choose not to impose discipline under these circumstances. Indeed, the Individual Plaintiffs provided exact case citations to the Defendants to ensure that Defendants considered this clearly established law. Compl. ¶¶ 58–60. In particular, *Holloman* presents a "materially similar case" from twenty years ago denying qualified immunity, even at the summary-judgment stage. *See Gaines*, 871 F.3d at 1208; *Holloman*, 370 F.3d at 1268–69; *accord* PI Order at 8–9. Beyond the details of *Holloman*, the *Tinker* line of cases provides "a broader, clearly-established principle" to clarify that Regulation 110(3) cannot provide a basis to discipline students in the absence of "material and substantial disruption." *See Gaines*, 871 F.3d at 1208, *Holloman*, 370 F.3d at 1274.

That is enough to demonstrate the Individual Defendants had "fair warning" under *Gaines*, defeating their qualified immunity claims. And yet, there is more. The Regulation itself prohibits "exercises of free speech" and other activities that are "protected under the First Amendment to the United States Constitution and Article 1 of the Florida Constitution." Compl. ¶ 52. If there were ever a scenario more befitting of *Gaines*' third category, this is it. One cannot imagine a regulation that more "obviously violate[s] the constitution" than a regulation that, as written, literally defies the First Amendment. *See Gaines*, 871 F.3d at 1208; *cf.* U.S. Const. art. VI, cl. 2.

The Individual Defendants try to immunize their unconstitutional actions by arguing they relied on Regulation 110(3) to impose discipline. But the cases they cite merely rehash the requirement that a law be clearly established for a claim to survive qualified immunity. *E.g.*, *Cooper v. Dillon*, 403 F.3d 1208, 1220 (11th Cir. 2005) (holding it was not clearly established at the time that a criminal statute amended to correct prior constitutional infirmities had in fact failed to correct those infirmities); *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994) ("Where a statute authorizes official conduct which is patently violative of fundamental

constitutional principles, an officer who enforces that statute is not entitled to qualified immunity.”).

Once a clear constitutional line has been drawn, like in *Tinker*, individual officers can no longer claim to be following orders or neutral regulations to immunize themselves from liability for violating that clear line. “[S]ince World War II, the ‘just following orders’ defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a ‘reason why any of them should question the validity of that order.”’ *O’Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004) (quoting *Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001)). This is not a situation where police officers were responding to a quickly evolving scenario out in the field and had to make split-second decisions. The Individual Defendants had months to consider the nondisruptive nature of Plaintiffs’ protest, and to read and evaluate *Tinker*, *Holloman*, and other precedent that insulate such protests from university discipline. Instead, they disregarded 60 years of precedent and punished the Individual Plaintiffs anyway. They are therefore manifestly ineligible to claim qualified immunity.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants’ motion to dismiss.

Respectfully submitted September 15, 2026,

*<u>/s/ Caroline A. McNamara</u>*
Nicholas L.V. Warren (FBN 1019018)
Caroline A. McNamara (FBN 1038312)
Michelle Morton (FBN 81975)
Amy Godshall (FBN 1049803)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134

Adam C. Saper (FBN 111750)
Miriam Fahsi Haskell (FBN 69033)
Alana Greer (FBN 92423)
**Community Justice Project**
3000 Biscayne Boulevard, Suite 106
Miami, FL 33137
(305) 907-7697
adam@communityjusticeproject.com

(786) 363-1769
nwarren@aclufl.org
cmcnamara@aclufl.org
mmorton@aclufl.org
agodshall@aclufl.org
dtilley@aclufl.org

Reid Levin (FBN 1038933)
**Reid Levin, PLLC**
P.O. Box 880682
Boca Raton, FL 33488
(561) 866-6089
reid@reidlevinpllc.com

miriam@communityjusticeproject.com
alana@communityjusticeproject.com

James Slater (FBN 111779)
**Slater Legal PLLC**
9000 Dadeland Boulevard, Suite 1500
Miami, FL 33156
(305) 523-9023
james@slater.legal

*Counsel for Plaintiffs*