Case 1:26-cv-25395-JB Document 30 Entered on FLSD Docket 08/21/2026 Page 1 of 28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 26-cv-25395-JB**

ICEBREAKERS, *et al.*,

Plaintiffs,

v.

JEANETTE NUÑEZ, *et al.*,

Defendants.
_______________________________________________/

## ORDER GRANTING PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION

Plaintiff ICEBreakers is a student-led organization mobilizing students, faculty, and other university community members to end Florida International University's ("FIU") agreement to deputize the FIU police department with the powers of federal Immigration and Customs Enforcement agents. ICEBreakers and seven of its members, all FIU students, Allyson Basden, Andrew Caro, Kaitlyn Daley, Caleb Dean, James Kuhlman, Reinier Luna, and Katyayani Tripathi ("the Individual Plaintiffs"), filed the instant Complaint against Jeanette Nuñez, in her official capacity as President of Florida International University, Carlos Duart, in his official capacity as Chair of the FIU Board of Trustees, Amelia Rodriguez, in her individual capacity as FIU's Associate Director of Student Conduct & Academic Integrity, Devin Parra, in his individual capacity as FIU's Assistant Dean of Students for Student Conduct & Academic Integrity, and Phillip Lloyd Hamilton, in his individual capacity as FIU's Assistant Vice President of Student Belonging & Support ("Defendants" or

"FIU"), alleging that FIU's speech regulation violates the First Amendment. Specifically, they challenge FIU's regulation that prohibits certain types of non-disruptive speech inside any of FIU's indoor facilities. That regulation was used to discipline, and potentially expel, the Individual Plaintiffs for wearing t-shirts that said "ICE OFF FIU" while they stood silently for a few minutes at an indoor FIU function.

On August 11, 2026, Plaintiffs filed the instant Expedited Motion (the "Motion") seeking that the Court preliminarily enjoin Defendants from enforcing FIU's indoor speech regulation against Plaintiffs or other ICEBreakers members. ECF No. [4]. Defendants filed a Response in Opposition to the Motion (the "Response"), ECF No. [14], and Plaintiffs filed a Reply (the "Reply"), ECF No. [18]. On August 20, 2026, the Court held oral argument on the Motion. ECF No. [19].

The issue before the Court today is whether Plaintiffs are likely to succeed in their challenge to FIU's regulation restricting non-disruptive speech on campus. Because over sixty years of First Amendment precedent supports Plaintiffs' position, the Motion is **GRANTED**.

## I. LEGAL FRAMEWORK

The First Amendment of the United States Constitution guarantees that "Congress shall make no law … abridging the freedom of speech…." U.S. Const. amend. I. As with any right, even those entrenched in our Constitutional core, the social order demands limitations. Free speech is no different. In this case, we must address those limitations on the free speech rights of students at a public university.

Any discussion of a student's freedom of speech in public schools certainly begins, and perhaps ends, with the Supreme Court's decision in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). In *Tinker*, a group of seven elementary, junior high, and high school students wore black armbands at school to voice their objections to the Vietnam War. *Id.* at 504. After the principals of their schools became aware of the students' plan to wear black armbands, they adopted a policy that "any student wearing an armband to school would be asked to remove it, and if he refused, he would be suspended until he returned without the armband." *Id.* Several students refused to remove their armbands, were suspended, and filed suit claiming that their First Amendment rights were violated by the school's policy. *Id.*

The district court dismissed the students' complaint, finding that the school's policy did not violate the Constitution in that it was "reasonable in order to prevent disturbance of school discipline." *Id.* at 504–05. On appeal, the Eighth Circuit considered the case *en banc*, was equally divided, and so the district court's decision was affirmed. *Id.*

The Supreme Court overturned the lower court's decision. The Supreme Court emphasized, at the outset, that it had "been the unmistakable holding of th[e] Court for almost 50 years" that "students [do not] shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506 (collecting cases). The Supreme Court found that the wearing of the armbands was "entirely divorced from actually or potentially disruptive conduct by those participating in it." *Id.* at 505. On

that record, there was no evidence of "interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone[,]" "no indication that the work of the schools or any class was disrupted[,]" and while "a few students made hostile remarks to the children wearing armbands, … there were no threats or acts of violence on school premises." *Id.* at 508. The "only suggestions of fear and disorder" arose from the fact that a former student had been killed in Vietnam and that his friends remained at the school and that students were overheard saying that they would wear armbands of other colors if the black bands prevailed.[1] *Id.* at 509, n.3. The school district's official memorandum regarding the ban made "no reference to the anticipation of … disruption." *Id.* at 509. As the Court observed, the ban was "directed against 'the principle of the demonstration' itself" as "[s]chool authorities simply felt that 'the schools are no place for demonstrations[.]'" *Id.* at 509, n.3.

Because there was no evidence to support that the wearing of the armbands "materially disrupt[ed] classwork or involve[ed] substantial disorder or invasion of the rights of others," the Court held that the "Constitution does not permit officials of the State to deny [the students] their form of expression." *Id.* at 513–14. The Court made clear that neither "undifferentiated fear or apprehension of disturbance" nor

[1] In his dissent, Justice Black pointed to testimony in the record showing that the armbands caused comments and warnings by other students. *Id.* at 518 (Black, J., dissenting). Justice Black also pointed to evidence that a mathematics teacher had his lesson period practically "wrecked" by disputes with one armband-wearing student. *Id.* at 518 (Black, J., dissenting). Despite this evidence, the majority concluded that the students' conduct in wearing the armbands was not disruptive.

"mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" is "enough to overcome the right to freedom of expression." *Id.* at 508–09. The Court explained:

> Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Id.* (internal citation omitted).

Nearly sixty years after it was decided, the *Tinker* standard still governs: student speech cannot be restrained unless it "materially disrupts" or "involves substantial disorder or invasion of the rights of others." *Id.* at 513.[2]

Indeed, just five years ago the Supreme Court revisited student speech again in *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 193 (2021). There, a public high school student posted on Snapchat, a social media application, criticizing the school and the school's cheerleading team using vulgar language and

[2] Following its decision in *Tinker*, the Supreme Court has carved out a few narrow categories of speech that a school may restrict without the threat of substantial disruption. *See Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675 (1986) ("offensively lewd or indecent student expression"); *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260 (1988) ("school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school"); *Morse v. Frederick,* 551 U.S. 393 (2007) ("student expression that [is] reasonably regarded as promoting illegal drug use"). Where, as here, the speech at issue "fall[s] outside of [those narrow] categories, [it] is subject to *Tinker*'s general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001).

gestures. *Id.* at 184–85. After the student's posts were spread among students, several members of the cheerleading squad and other students approached the cheerleading coaches "visibly upset" about the posts and, during an Algebra class taught by one of the cheerleading coaches, questions about the posts persisted. *Id.* at 185. The student was ultimately suspended from the cheerleading squad for the upcoming year because the posts used profanity in connection with a school extracurricular activity in violation of both the team and school rules. *Id.*

The district court found in the student's favor, determining that her posts had not caused substantial disruption at the school. *Id.* at 186. The Third Circuit affirmed. *Id.* The issue before the Supreme Court was whether *Tinker* applies to student speech that occurs off campus. *Id.* at 187.

Applying *Tinker* to off-campus speech, the Court found "no evidence in the record of the sort of 'substantial disruption' of a school activity or a threatened harm to the rights of others that might justify the school's action." *Id.* at 192 (quoting *Tinker*, 393 U.S. at 514). The Court explained that the "alleged disturbance"—five to ten minutes of discussion during an algebra class and some cheerleaders being "upset" about the posts—did "not meet *Tinker*'s demanding standard[,]" which requires "more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 192–93 (quoting *Tinker*, 393 U.S. at 509). As to the concern for the cheerleading team's morale, the Court explained that "simple 'undifferentiated fear or apprehension … is not enough to overcome the right to freedom of expression.'" *Id.* at 193 (quoting *Tinker*, 393 U.S. at 508).

In the decades since *Tinker* was decided, the Eleventh Circuit has faithfully applied its standard to student speech. *See, e.g., Damsky v. Summerlin*, No. 25-14171, 2026 WL 75122, at *5 (11th Cir. Jan. 8, 2026) (applying *Tinker* and holding that a student's social media post caused substantial disruption of the school's activities by creating a credible fear of targeted violence); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1231 (11th Cir. 2018) (determining that the plaintiff's conduct interfered with the rights of another student and thus the college "was free to regulate it under *Tinker* without impinging on [plaintiff]'s First Amendment rights"); *Jane Doe I v. Valencia Coll. Bd. of Trs.*, 838 F.3d 1207, 1212 (11th Cir. 2016) (applying *Tinker* and explaining that the college employees must tolerate the students' complaints … 'unless the expression will lead to 'substantial disruption of or material interference with school activities'"); *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 983, 985 (11th Cir. 2007) (applying *Tinker* and upholding a school's suspension of a student because the student wrote about shooting her teacher in a notebook and shared it with another student, which "clearly caused and was reasonably likely to further cause a material and substantial disruption"); *Heinkel ex rel. Heinkel v. Sch. Bd. of Lee Cnty., Fla.*, 194 F. App'x 604, at *5 (11th Cir. 2006) (applying *Tinker* and upholding a school's prohibition against a middle school student's distribution of pro-life literature to her classmates because the record supported the findings of the district court that the school authorities reasonably forecasted substantial disruption of, or material interference with, school activities); *Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246, 1249–50 (11th Cir. 2003) (applying *Tinker* and holding that "school administrators

did not violate the [students'] constitutional rights by banning the display of Confederate flags on school grounds and subsequently enforcing the ban by suspending them" when school officials presented evidence of racial tensions existing within the school including fights that seemed to be racially motivated occurring in the months preceding the ban).

One of those precedents merit particular note here. In *Holloman ex rel. Holloman v. Harland*, the Eleventh Circuit applied the *Tinker* standard when evaluating whether a student's raising of his fist during the pledge of allegiance as a sign of protest was protected under the First Amendment. *See generally* 370 F.3d 1252 (11th Cir. 2004). The Court found no evidence of substantial "disturbance or unrest" or "any real impact on class discipline" and that the gesture was not directed toward anyone or any group such that it could be construed as a personal offense or insult. *Id.* at 1272, 1274–75. Thus, consistent with *Tinker*, the Court held that the student's protest was entitled to First Amendment protection. *Id.* at 1274.

In reaching its holding, the Court disagreed that it was appropriate for the school official to discipline the student because other students were "disturbed" by the protest or out of concern that the protest would lead to further disruptions by other students. *Id.* The Court reasoned that "[t]he fact that other students may have disagreed with [the student raising his fist during the pledge of allegiance] or the message it conveyed" is irrelevant to the material-disruption analysis. *Id.* at 1275–76. The Court further reasoned that the fact that other students "may react inappropriately or illegally" does not justify suppression of the student's expression.

*Id.* at 1276. The Court went on to note that "the specter of disruption or the mere theoretical possibility of discord, or even some *de minimis,* insubstantial impact on classroom decorum" is insufficient to restrain student speech." *Id.* at 1271. Indeed, student expression cannot be suppressed "simply because it gives rise to some slight, easily overlooked disruption, including but not limited to a showing of mild curiosity by other students, discussion and comment among students, or even some hostile remarks or discussion outside of the classrooms by other students." *Id.* at 1271–72 (internal citations and quotation marks omitted). Emphasizing what *Tinker* teaches, the Court stated, "Where students' expressive activity does not materially interfere with a school's vital educational mission, and does not raise a realistic chance of doing so, it may not be prohibited." *Id.* at 1274 (emphasis in original).

In short, when all is said and done, and for at least sixty years, the standard has been the same: student speech cannot be curtailed unless it materially disrupts the educational mission or involves substantial disorder or invasion of the rights of others. Against this standard,[3] we now measure FIU's regulation on student speech.

---

[3] This Court recognizes that it is still unsettled whether in the university setting the standard may not be more restrictive given that the speech at issue does not involve children but involves the speech of adults. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) ("[I]t's not at all clear that *Tinker*'s more lenient standard applies in the university—as opposed to the elementary- and secondary-school—setting. The caselaw sends mixed signals." (collecting cases)). However, because *Tinker* would be more lenient, the Court will review this matter under that standard. Indeed, if the regulation at issue here does not comply with *Tinker*, they most certainly could not comply with a more stringent standard.

## II. REGULATION 110(3): FIU'S INDOOR SPEECH RESTRICTION

Student conduct at FIU, as in most schools, is governed by series of university policies and regulations. At issue here is Regulation 110(3) (the "Regulation") which regulates speech indoors. ECF No. [4-11]. Specifically, as to activities in the indoor areas of campus, Regulation 110(3) states that:

> [t]o protect health, safety, and welfare and prevent disruption of University activities, protests, parades, marches, picketing, demonstrations, and other similar expressive activities are prohibited inside University buildings or other University indoor facilities. University buildings and other University indoor facilities are designed for instruction, study, reflection, group discussion, research, administrative functions, and other University activities and operations. This provision will be enforced in a content and viewpoint neutral manner.

*Id.* at 1. Regulation 110 defines "expressive activities" as:

> activities such as assemblies, demonstrations, exercises of free speech, protests, parades, marches, and picketing protected under the First Amendment to the United States Constitution and Article 1 of the Florida Constitution. Expressive activity does not, for purposes of this regulation, include commercial speech.

*Id.* Although not at issue, two other provisions are relevant to the analysis. First, with respect to activities in the outdoor areas of campus, Regulation 110(2) states that:

> Subject to the terms of this regulation and related University regulations, expressive activities are permitted in outdoor areas of campus so long as the conduct is lawful and does not materially and substantially disrupt the normal operations of the University or materially and substantially infringe upon the rights of others.

*Id.* Second, Regulation 110(14), speaks generally as to disruptive conduct, providing that "University Community members or University Organizations who intentionally

act to materially and substantially impair, interfere with, or obstruct the orderly conduct, processes, and functions of the University or materially and substantially interfere with, or infringe upon, the rights of others, are subject to appropriate disciplinary action and/or removal by the University authorities." ECF No. [4-11] at 4. Similarly, the Student Code of Conduct prohibits "disruptive conduct"—which is defined as follows:

> i. Behavior that substantially and materially disrupts, disturbs, impairs, interferes with or obstructs the orderly conduct, processes and functions of the University or the rights of other members of the University community.
>
> ii. Behavior that substantially and materially disrupts, disturbs, impairs, interferes with or obstructs the orderly conduct, processes, and functions of the classroom, or laboratory and/or immediate surrounding areas. This includes interfering with the academic mission of the University or individual classroom or interfering with a faculty member or instructor's role to carry out the normal academic or educational functions of their classroom laboratory and/or immediate surrounding areas.
>
> iii. Behavior that substantially and materially disrupts, disturbs, impairs, interferes with or obstructs the Student Conduct process, including, but not limited to, harassment and/or intimidation of any member of the Student Conduct Committee, Witness or University personnel before, during or after a proceeding, or attempting to coerce or influence any person(s) in order to discourage their participation in any Student Conduct proceeding.
>
> iv. Any behavior that substantially and materially disturbs the peace.

ECF No. [4-12] at 9–10.

## III. PLAINTIFFS' SILENT PROTEST

On March 13, 2026, FIU's President, Defendant Nunez, was interviewing a former professional athlete at FIU's Modesto Madique Campus in an indoor auditorium with the capacity to sit seven hundred people.[4] The event was attended by Plaintiffs and several other members of ICEBreakers, who were wearing T-shirts that said, "ICE OFF FIU." ECF No. [14-3]. They sat in the center and on the left and right side of the auditorium. *Id.* In total, the number of persons with the T-shirt appears to have been no more than fifteen. *Id.*

At some point during the President's interview, Plaintiffs and the others wearing the "ICE OFF FIU" T-shirt stood and faced the audience. *Id.* They stood for at least one minute but it does not appear that they stood for more than three. *Id.* They said nothing. *Id.* They carried nothing in their hands. *Id.* Plaintiffs then left the auditorium, again, saying nothing. *Id.* Despite the fact that security and other FIU personnel were present at the event, no one asked them to leave. ECF Nos. [4-2] ¶ 11; [4-3] ¶ 11; [4-4] ¶ 11; [4-5] ¶ 11; [4-6] ¶ 11; [4-7] ¶ 11; [4-8] ¶ 11. From the evidence presented to date, it does not appear that Defendant Nunez or the speaker noticed these students, and if they did, the interview proceeded without any interruption. ECF No. [14-3]. No attendee complained or otherwise raised any concern regarding Plaintiffs' conduct. ECF No. [4-9].

---

4 FIU Central Reservations, *Student Academic Success Center*, https://centralreservations.fiu.edu/venues/profile/sasc-auditorium.html (last visited Aug. 23, 2026).

Once Plaintiffs and the others who were wearing the "ICE OFF FIU" T-Shirt left the event, they were met with what appear to be FIU police officers right outside of the doors to the auditorium. ECF No. [14-3]. Again, Plaintiffs do not appear to be saying anything, nor "protesting" in any way other than by wearing their "ICE OFF FIU" T-shirts. *Id.*

In the body worn camera footage provided to the Court, an adult woman who appears to be with the students asks a police officer why the students were not being afforded their First Amendment rights and then provides direction to the students about what they should do. *Id.* Specifically, she tells the students that they are free to leave. *Id.* The police officer instructs the students to be no more than fifty feet away from any building.[5] *Id.*; ECF No. 4-11 at 1 (providing that expressive activities may take place "in outdoor areas of campus, except within fifty (50) feet of … buildings [or] facilities"). Most of the students (again approximately fifteen) leave the area heading in different directions. ECF No. [14-3].

In short, based on the evidence submitted to date, it does not appear that any Plaintiff, or anyone else wearing an "ICE OFF FIU" T-shirt, spoke or did anything other than sit, stand, and walk.

---

[5] FIU, in its Response in Opposition, ECF No. [14], argues that Plaintiffs were free to organize "immediately outside the building where this event took place." The video evidence they cite directly contradicts this as the students were asked to move 50 feet from any building on campus.

## IV. FIU'S DISCIPLINARY PROCEEDINGS AGAINST PLAINTIFFS

Days after the event, the matter was referred to the Office of Student Conduct & Academic Integrity, and Defendant Rodriguez was placed in charge of investigating the protest. Defendant Rodriguez emailed, Jehnny Rivera, the Executive Director of the Office of University Protocol, Ceremonies & Events, whose office oversaw the event and requested information about the protest. ECF No. [4-9]. In her email, Defendant Rodriguez stated that according to the information she received "there were individuals who stood up and obstructed the view of other attendees while the speaker was actively addressing the audience." *Id.*[6] She then asked for any additional information, and asked whether Ms. Rivera could "confirm if there was a disruption or a delay to the event? Did any attendees come forward at any point during or after the event to share that their view was obstructed or that they were bothered by the situation?" *Id.*

Ms. Rivera responded the same day as follows:

> Thank you for reaching out. Yes, there was an incident during the event in which approximately 10–15 individuals stood up, faced the audience, and removed their sweaters or sweatshirts to display identical t-shirts. The incident lasted approximately 3–5 minutes.
>
> One of the speakers briefly acknowledged the incident; however, it did not disrupt the event, and the speakers were able to continue their discussion. No other attendees approached me directly to raise concerns about the incident.
>
> Please feel free to reach out if you need anything else.

---

[6] At this stage of the litigation, the Court does not have any evidence of what this information was or the source of this information.

*Id.* Although it appears that she did not receive any confirmation of a disruption, on April 7, 2026, Defendant Rodriguez issued letters to each of the Individual Plaintiffs, charging them with misconduct for failing to comply with FIU Regulation 110, "Expressive Activities in Outdoor Areas of Campus." *See, e.g.,* ECF No. [4-13]. Defendant Rodriguez and FIU's Counsel Ryan Kelley later specified that each student was being charged with failing to comply with Section 3 of Regulation 110 based on their conduct at the event. ECF No. [1] ¶ 50.

For the next two months, Defendant Rodriguez held "information sessions" with the Individual Plaintiffs, and members of FIU's Counsel's Office. ECF Nos. [4-2] ¶ 14; [4-3] ¶ 14; [4-4] ¶ 14; [4-5] ¶ 14; [4-6] ¶ 14; [4-7] ¶ 14; [4-8] ¶ 14. Plaintiffs allege that at each information session, they were told that they were not being charged with disruptive conduct, because that was not supported by FIU's investigation. ECF No. [1] ¶ 54. Plaintiffs then allege that the investigation corroborated that no attendees or university staff complained to the police that the students obstructed their view. *Id.* ¶ 57. As noted above, the staff member in charge of the event confirmed that the protest "did not disrupt the event."[7] ECF No. [4-9].

[7] Defendants, in response to the Motion, have submitted the Affidavit of FIU Police Officer Francisco Ganumdi. ECF No. [14-4]. Officer Ganumdi avers that he was present at the event as part of his "official duties as a detective with the FIU Police Department to provide general security and support for the event." *Id.* ¶ 2. Officer Gamundi also avers that the students who stood as part of the silent protest "obstructed the view of the stage preventing audience members in the rows behind the standing attendees from being able to see the stage." He adds that those students all left at the same time and that from his perspective the students "disrupted the event, both by obstructing other audience members' view of the vent and by causing a distraction when they stood up together and left the auditorium all at the same time." *Id.* ¶ 4. This is the only evidence in the record that the students presented

After providing Defendant Rodriguez with Supreme Court case law (some of which is outlined above) that they believed made their conduct permissible, Plaintiffs requested that Defendant Rodriguez close the misconduct cases. ECF No. [1] ¶¶ 58–61. Defendant Rodriguez did not do so. *Id.* ¶ 62. Instead, Plaintiffs were informed that the case would be proceeding to hearing. *Id.* ¶¶ 63–64.

After the hearing, Defendant Parra sent each Individual Plaintiff (except Plaintiff Kuhlman) a letter finding that their actions on March 13, 2026, failed to comply with Regulation 110(3). *Id.* ¶ 65; ECF No. [4-14]. As a result of violating the Regulation, Plaintiffs received a written reprimand, and each were directed to submit a "video reflection." ECF No. [1] ¶ 66; ECF No. [4-14]. Specifically, each are now required to:

> Create a two-minute video explaining your understanding of FIU Regulation 110, what is expected under FIU Regulation 110 related to indoor and outdoor areas, and how you will apply what you have learned moving forward. The video must be your original work. The video must be thoughtful and substantive in its response to the prompt. The Office of Student Conduct and Academic Integrity reserves the right to ask you to resubmit your work if it does not adhere to the outlined instructions.[8]

ECF No. [1] ¶ 67; ECF No. [4-14]. The Individual Plaintiffs who were cited for misconduct appealed the decision. ECF No. [1] ¶ 68. FIU denied their appeal. *Id.*; ECF No. [4-15].

---

any "disruption" albeit it does not appear to have been part of the students' disciplinary proceedings.

[8] Because the Court will preliminarily enjoin Defendants from enforcing Regulation 110(3) against the Individual Plaintiffs for the reasons explained *infra*, the imposition of this and any other sanction related to this disciplinary action is stayed. As such, the Court need not make any determination as to whether requiring a statement of this kind is permissible.

FIU is now requiring that the six Individual Plaintiffs submit "video reflections" by September 4, 2026. ECF No. [1] ¶ 69. If any Plaintiff fails to submit an acceptable video, FIU will place a "student conduct hold" on their academic records. *Id.* This hold prevents a student from registering for classes, as well as from obtaining financial aid, transcripts, a diploma, or copies of any other academic records. ECF No. [4-14]. In addition, FIU also notified Plaintiffs that it could bring further action against them if they fail to complete the required video reflection. ECF No. [1] ¶ 69.

## V. THE INSTANT MOTION FOR PRELIMINARY INJUNCTION

In their Motion, Plaintiffs argue that they are substantially likely to succeed on the merits, as Regulation 110(3) restrains the exercise of free speech in violation of *Tinker*. ECF No. [4] at 6–7. Plaintiffs further argue that Regulation 110(3) is an unconstitutional content-based restriction, and unconstitutionally overbroad. *Id.* at 7–9. In addition, Plaintiffs argue that they satisfy the remaining preliminary injunction factors. *Id.* at 9–10. They request that the Court preliminarily enjoin Defendants from enforcing FIU Regulation 110(3) against Plaintiffs and other ICEBreakers members. *Id.* at 10.

In Response, Defendants argue that Regulation 110(3) is a reasonable regulation of FIU's indoor facilities. ECF No. [14] at 5–12. Defendants also argue that Regulation 110(3) is not facially overbroad. *Id.* at 12–14. They assert that Plaintiffs failed to demonstrate substantial likelihood on the merits, and therefore, the Motion should be denied. *Id.* at 14.

In Reply, Plaintiffs assert that FIU's speech regulation, and Plaintiffs' punishment, violate their First Amendment rights, emphasizing that Regulation 110(3) fails the *Tinker* standard, is an unconstitutional content-based restriction, and is unconstitutionally overbroad. ECF No. [18] at 6–10.

## VI. ANALYSIS

To obtain a preliminary injunction, the moving party must establish that "(1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020). "The third and fourth factors merge when, as here, the government is the opposing party." *Id.* (quotation marks omitted) (quoting *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020). "At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quotation marks omitted). Here, FIU does not challenge the second, third or fourth prong. Instead, the issue only issue in dispute is whether Plaintiffs have a substantial likelihood of success on the merits. For the reasons stated below, the Court finds that they do.

### A. Substantial Likelihood of Success on the Merits

At this stage, Plaintiffs are substantially likely to prevail on their claim that Regulation 110(3) impermissibly prohibits Constitutionally protected speech by

failing to limit its prohibition to speech that causes substantial disruption. The provision bears repeating. Regulation 110(3) states that:

> [t]o protect health, safety, and welfare and prevent disruption of University activities, protests, parades, marches, picketing, demonstrations, and other similar expressive activities are prohibited inside University buildings or other University indoor facilities. University buildings and other University indoor facilities are designed for instruction, study, reflection, group discussion, research, administrative functions, and other University activities and operations. This provision will be enforced in a content and viewpoint neutral manner.

ECF No. [4-11] at 1. When read in conjunction with the definition of "expressive activities" as set forth in he Regulation, prohibited indoor activities specifically includes activities that are "exercises of free speech … protected under the First Amendment." *Id.* Thereafter, there is no limitation, as there is for outdoor speech, to speech that materially and substantially disrupts the normal operations or materially and substantially infringes upon the rights of others. *Id.* at 1–2. Instead, *all* "protests, parades, marches, picketing, demonstrations, and other similar expressive activities are prohibited" regardless of whether they cause any disruption. *Id.* at 1. Indeed, here, there is no evidence that Plaintiffs' conduct on March 13, 2026, did not materially disrupt the event, and yet, the Regulation was cited as the basis for FIU's action against the students.

FIU does not argue that Regulation 110(3) prohibits expressive activities that cause *material* disruption. Nor could they, given that the Regulation's plain language makes no mention of any such limitation. Instead, FIU argues a couple of variants, most of which misconstrue Plaintiffs' arguments or the applicable law.

First, they argue that Plaintiffs are asserting "a nearly-unlimited right to protest on government property." ECF No. [14] at 5. The Court rejects this characterization as it finds no such argument in the Motion. Instead, the Motion squarely addresses what *Tinker* requires, that restrictions on student speech be limited to those activities and expressions that cause material disruption. *See* ECF No. [4] at 6. That is hardly a "nearly-unlimited" right; it is simply the law.

Second, FIU argues that in relying on *Tinker*, Plaintiffs ignore First Amendment cases concerning appropriate time, place and manner restrictions. ECF No. [14] at 6. Here, FIU relies on its right to create rules to maintain order and decorum. *Id.* at 8 (citing *Burnside v. Byars,* 363 F.2d 744, 748 (5th Cir. 1966)). In doing so, it invites the Court to conduct an analysis of the type of public forum at issue in order to assess whether Regulation 110(3) is valid. FIU asserts that the university (arguably all of it) is a limited public forum, and then argues that Plaintiffs have failed to show that the Regulation "applies to a designated portion of campus that FIU has intentionally held open for general public expression." *Id.* at 8. FIU concludes that the auditorium here is a limited public forum and conducts its analysis from there.

The problem with FIU's invitation is that it points the Court down a road not taken in *any* school speech case either by the Supreme Court or the Eleventh Circuit. Indeed, the cases FIU cites do not involve student speech or are otherwise inapplicable. *See, e.g., McDonough v. Garcia*, 116 F.4th 1319, 1322 (11th Cir. 2024) (pertaining to a restriction on speech at city council meetings—not student speech);

*Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1213 (11th Cir. 2004) (concerning "school-sponsored speech," a category of speech not at issue here that is excepted from *Tinker*'s material-disruption requirement); *Moms for Liberty v. Brevard Pub. Sch.*, 118 F.4th 1324, 1332 (11th Cir. 2024) (conducting forum analysis to parents'—not students—challenge to school board's rules against "abusive," "personally directed," and "obscene" speech at board meetings); *Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011) (conducting forum analysis not as to student speech but as to a preacher's challenge to university policy restricting outside, non-sponsored speakers from campus); *Holloman*, 370 F.3d at 1271 (addressing student speech but not conducting a forum analysis and only mentioning "forum" once in citation concerning viewpoint discrimination that did not involve student speech); *Burnside,* 363 F.2d at 744 (addressing student speech but not conducting a forum analysis or even mentioning the term "forum").

To be sure, even their own walk down the public fora road takes them to *Tinker*, *see* ECF No. [14] at 9, and then to the general proposition that student expression can be regulated when doing so contributes to the maintenance of order.[9] *Id.* (citing

---

[9] As the Supreme Court has explained, its precedent "leave[s] no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Id.* "[T]o the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Id.* (alterations adopted) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)); *see also Speech First*, 32 F.4th 1110, 1129 (11th Cir. 2022) (Marcus, J., concurring) ("Universities should be expected to provide the conditions within which hard thought, and therefore strong disagreement, independent judgment, and the questioning of stubborn assumptions, can flourish in an environment of the greatest freedom." (quoting Report of the Committee on Freedom of Expression, Univ. of Chicago (2015)).

*Holloman*, 370 F.3d at 1271). Of course, no one, including Plaintiffs, takes issue with the fact that student speech can be regulated. The issue is to what extent such regulations are permitted by the Constitution, an issue resolved by *Tinker* and as shown above, repeatedly adopted by this Circuit.

As such, it is not surprising that FIU relies on a Fourth Circuit case and a D.C. Circuit case for this point. Putting aside that neither is controlling, both are easily distinguishable. In *Sword v. Fox*, the Fourth Circuit upheld the constitutionality of a college regulation that forbid "demonstrations"—defined by the regulation as "a public manifestation of welcome, approval, protest, or condemnation as by a mass meeting, procession, picketing, or occupation of premises"—"inside any buildings." 446 F.2d 1091, 1093 (4th Cir. 1971); *Sword v. Fox*, 317 F. Supp. 1055, 1068 (W.D. Va. 1970) (setting forth challenged regulation's text in full), *rev'd and remanded*, 446 F.2d 1091. The regulation at issue in *Sward* is clearly more narrow than Regulation 110(3), as "demonstrations" reaches only "a *mass* meeting, procession, picketing, or occupation of premises." *Sword*, 317 F. Supp. at 1068 (emphasis added). Indeed, by its very definition, the language in *Sword* captures conduct that would be materially disruptive to any indoor activity. Regulation 110(3), by contrast, contains no such language, and so it can extend to conduct as limited as a lone student wearing a button as a sign of protest or a small group of students assembling at lunch in the Student Union to discuss opposition to any issue. *See* ECF No. [4-11] at 1. Although the Fourth Circuit in *Sword* did not evaluate the challenged regulation under *Tinker*, it evaluated the regulation under a test of reasonableness, stating that "the test for

the reasonableness of college regulations is whether such regulations 'measurably contribute(s) to the maintenance of order and decorum within the educational system', are calculated to prevent interference with 'the normal activities of the University' or obstruction to its function 'to impart learning and to advance the boundaries of knowledge', or are important in maintaining 'order' and 'normal operations.'" *Id.* at 1097. Notably, all of the cases cited in support of the reasonableness test it employed predate the Supreme Court's decision in *Tinker*. *See id.* (citing *Burnside v. Byars*, 363 F.2d 744, 748 (5th Cir. 1966), *Goldberg v. Regents of Univ. of California*, 248 Cal.App.2d 867 (1967); *Waugh v. Board of Trustees of University of Mississippi*, 237 U.S. 589 (1915)).

Further, in *United States v. Nassif*, the second case relied on by FIU, the court examined the criminal sentencing of a defendant convicted for his participation in the January 6, 2021, riot at the United States Capitol. 97 F.4th 968 (D.C. Cir. 2024). In doing so, the D.C. Circuit upheld a prohibition on "parad[ing], demonstrat[ing], or picket[ing] in any of the Capitol Buildings." *Id.* at 974 (quoting 40 U.S.C. § 5014(e)(2)(G)). Again, the provision at issue there was narrower than the one at hand which includes protests and explicitly prohibits exercises of free speech. In any event, in determining whether that prohibition was Constitutional, the court treated the Capitol buildings as a "nonpublic forum" and then considered whether the prohibition survived the "limited review" governing speech restrictions in a nonpublic forum, which requires only that "the restrictions on speech are not viewpoint-based" and "reasonable" in light of the purpose of the forum. *Id.* at 978. Because a D.C. Circuit

case is not controlling in this Circuit, and because the case dealt with speech outside of a school setting, the Court finds it entirely unpersuasive. Indeed, the Court sees no reason to entertain an out of circuit case on a different topic when both the Supreme Court and the Eleventh provide the Court with persuasive and controlling precedent on the standard it must apply in this case.

As was well-settled by the Supreme Court and this Circuit, a prohibition on student speech is not subject to the "limited review" conducted in *Nassif*; it subject to "*Tinker*'s demanding standard[,]" which permits the restriction of speech only where it "materially disrupts" or "involves substantial disorder or invasion of the rights of others." *Mahanoy Area Sch. Dist.*, 594 U.S. at 188, 193 (quoting *Tinker*, 393 U.S. at 513). Indeed, the purposes served by a capitol building and a school are markedly different, and the appropriate bases for restricting speech in each setting differ accordingly. *Compare id.* at 190 ("America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the 'marketplace of ideas.' This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will.") *with Nassif*, 97 F.4th at 979 ("[C]ongressmembers and their staffs require secure and quiet places to work on legislative proposals and meet with colleagues and constituents. … [T]he interest in a workplace where legislators and staff may do their jobs undisturbed by parades, pickets, or demonstrations comports with accessibility and is plainly legitimate.").

Running through Defendants' argument is the repeated distinction between indoor and outdoor activities. To be sure, an activity that is completely banal when conducted outdoors (fifty students clapping and chanting from an outdoor lawn), would unquestionably be materially disruptive if it happened inside a classroom. In *Holloman*, the Eleventh Circuit made the same observation, noting that "[c]onduct that may be constitutionally protected in one school or under one set of circumstances may tend to incite disruption or disorder—and so be constitutionally proscribable—in others." 370 F.3d at 1274. It might be, as FIU notes, "easy-to-administer," ECF No. [14] at 12, but it is not permissible under the Constitution.

Finally, at Oral Argument and more generally throughout its Response, FIU argues that Regulation 110(3)'s language actually does limit the expressive activities to which it applies to those that cause disruption. FIU prompts the Court to consider that "similar expressive activities," which otherwise specifically encompasses activities such as assembly and free speech activities, is limited by the words "protests, parades, marches, picketing, demonstrations" and framed by the opening clause which cites to FIU's interest in preventing disruption. ECF No. [14] at 10–11. This argument is unpersuasive. Even if the words "protests, parades, marches, picketing, demonstrations" limits "expressive activities" to those that are "similar" to it, an argument the Court is skeptical of given that expressive activities is a defined term, it is entirely without support that those words limit the activities to those that

are materially or substantially disruptive.[10] Indeed, as was the case here, a protest can be peaceful, but still violate Regulation 110(3). A student can wear a hat, a T-shirt, or as they did in *Tinker,* an armband to protest. In any event, the argument is neither here nor there because even if the Regulation was attempting to limit only disruptive activity, disruptive activity alone fails Constitutional scrutiny. *See Holloman*, 370 F.3d at 1271 (emphasizing that student expression "must cause (or be likely to cause) a 'material and substantial" disruption, … and more than a brief, easily overlooked, *de minimis* impact, before it may be curtailed" (citation omitted)). The standard is clear, and has been so for decades.

**B. The Remaining Preliminary Injunction Factors**

Because "[P]laintiffs have shown a likelihood of success on the merits, the remaining requirements necessarily follow." *Honeyfund.com Inc. v. Governor*, 94

---

[10] Had FIU wanted to limit Regulation 110(3) to speech that is materially disruptive, it certainly knew how to do so, as evidenced by its use of material-disruption-based language elsewhere in its regulations. *See* ECF No. [4-11] at 1 (permitting outdoor expressive activities "so long as the conduct is lawful and does not materially and substantially disrupt the normal operations of the University or materially and substantially infringe upon the rights of others"); *id.* at 4 (providing that those who "intentionally act to materially and substantially impair, interfere with, or obstruct the orderly conduct, processes, and functions of the University or materially and substantially interfere with, or infringe upon, the rights of others, are subject to appropriate disciplinary action"); ECF No. [4-12] at 9–10 (prohibiting students from engaging in "disruptive conduct" which is defined to include "[b]ehavior that substantially and materially disrupts, disturbs, impairs, interferes with or obstructs the orderly conduct, processes and functions of the University or the rights of other members of the University community").

F.4th 1272, 1283 (11th Cir. 2024). "Plaintiffs suffer an irreparable injury because there is an 'ongoing violation of the First Amendment.'" *Id.* (quoting *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017)). "[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). With respect to the harm that would result if an injunction were put in place, Defendants are in no way harmed by the issuance of a preliminary injunction because they have "no legitimate interest in enforcing an unconstitutional ordinance." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Similarly, a preliminary injunction is "not contrary to the public interest because it is in the public interest to protect First Amendment rights." *Honeyfund*, 94 F.4th at 1283. In sum, all of the factors to be considered in awarding a preliminary injunction weigh in Plaintiffs' favor.[11]

---

[11] The Court declines to set a bond as one is not necessary nor have Defendants requested one. The Court does not find that Defendant will suffer any appreciable harm should the Court enjoin enforcement of the Regulation against Plaintiffs. *See AFC Enters., Inc. v. THG Restaurant Grp.*, LLC, 416 F. App'x 898, 898 (11th Cir.2011) ("[I]t is within the discretion of the court to set the amount of the bond or to require 'no security at all.'") (quoting *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, LLC, 425 F.3d 964, 971 (11th Cir. 2005)).

## VII. CONCLUSION

Because Plaintiffs are likely to prevail on their claims given that the Regulation prohibits indoor activities without any regard for whether the activity materially disrupts the school's operations,[12] the Court GRANTS the Motion.[13] As such, it is hereby **ORDERED** that Defendants Nuñez and Duart, as well as their agents, are **PRELIMINARILY ENJOINED** from enforcing Regulation 110(3) against the individually named Plaintiffs and the members of Plaintiff ICEBreakers.

**DONE AND ORDERED** in Chambers at Miami, Florida this 23rd day of August, 2026.

**JACQUELINE BECERRA**
**UNITED STATES DISTRICT JUDGE**

---

[12] The Court notes that activities that materially disrupt the operations of the university, be it indoors or outdoors, are already prohibited by other regulations not at issue in this case.

[13] Plaintiffs argue that Regulation 110(3) is an unconstitutional content-based restriction, ECF No. [4] at 7–9, and that the Regulation is facially overbroad, *id.* at 8–10, an argument that Defendants address in its Response in Opposition, ECF No. [14] at 12–14. Because the Court finds that Plaintiffs are likely to prevail on their argument that the Regulation violates the First Amendment, the Court accepts Plaintiffs' invitation at Oral Argument to decline consideration of these arguments at this time.